**Howard J. GREENFIELD, Plaintiff,**

v.

**Bert KANWIT, Defendant.**

**No. 77 Civ. 1240 (WK).**

United States District Court,
S. D. New York.

Aug. 4, 1982.

Bleakley, Platt, Schmidt & Fritz, White Plains, N. Y., for plaintiff.

Meiselman, Farber, Stella & Moran, P. C., Poughkeepsie, N. Y., for defendant.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

The various claims set forth in the complaint in this diversity action arose out of a prolonged and bitter dispute between the defendant, a member and sometimes chairman of the "Peer Review Committee" (the "Committee") of the Dutchess County Medical Society (the "Society"), and the plaintiff, a member of that Society. After the case had been pending for about three and one-half years and exhaustive discovery (including thirteen depositions) had been

taken, the defendant moved before Judge Lasker for summary judgment.[1] Thereafter—for reasons having nothing to do with the merits of the case—Judge Lasker became disqualified, and the matter was referred to us. For reasons which follow we grant the defendant's motion.

### Facts

#### Background

The Dutchess County Medical Society is a private, voluntary, professional society whose membership consists of physicians practicing in Dutchess County, New York. The Society's Peer Review Committee—like its counterparts in similar societies throughout the state—is a sounding board for concern over the quality of patient care. Its official purposes, set forth in its By-Laws, include protecting the public from incompetent, corrupt, dishonest or unethical physicians; and defending physicians against ill-founded and unjust accusations. In pursuit of these goals, it both accepts complaints from all "responsible" sources, and undertakes to recommend appropriate action.

In April of 1975, during defendant's tenure as chairman, the Peer Review Committee received a letter from Metropolitan Life Insurance Company (an insurer under a group "covered medical expenses" policy) complaining about certain fees, charged by plaintiff for endo-sinal and endo-nasal surgery, for which Metropolitan was responsible under its policy. In the following month a second such letter was received from Metropolitan and a third from Bankers Life Company. Defendant notified plaintiff of one of these letters. Plaintiff made a five page response which set forth in detail his surgical techniques; extolled their "tremendous advantages" over usual procedures; and requested the opportunity to present a graphic demonstration to members of the Committee. This request was denied.

Allegedly at defendant's instigation, the Peer Review Committee undertook a broad-ranging investigation which covered not only the fees plaintiff charged, but also the propriety of his medical procedures. According to plaintiff, this investigation went way beyond any legitimate necessity and therefore must have been primarily motivated by defendant's personal malice towards him. Plaintiff complains in particular of the failure to refer the fee inquiries to someone in his own specialty, as required by the Committee's By-Laws; the refusal to accord him a hearing as further required by those By-Laws;[2] and the fact that through December of 1975 in pursuit of the investigation, defendant—over plaintiff's objection—wrote letters to various educational institutions and other third parties requesting evaluation of plaintiff's medical procedures.[3] Two of these letters in partic-

1. The following people were deposed: plaintiff; plaintiff's wife; defendant; Patricia DeLorenzo, executive secretary of the Dutchess County Medical Society at the time in question; Andree Sullivan, present director of that Society; Dr. Eugene Koloski, an internist practicing in Dutchess County and a member of the Peer Review Committee at the time of the Greenfield controversy; Dr. Robert Weiss, a neurological surgeon practicing in Dutchess County throughout the relevant period; Dr. Howard B. Josias, a Dutchess County dentist; Dr. Vincent Catalano, an oral surgeon practicing in Dutchess County; Dr. Martin Koloski, general surgeon with the Poughkeepsie Surgical Group and presently Chairman of Surgery at Vassar Brothers Hospital in Poughkeepsie; Dr. Vincent Beltrani, an allergist practicing in Dutchess County; Dr. Lawrence Savetsky, Assistant Professor of Clinical Otolaryngology at Columbia University and Chief of the Otolaryngology Clinic at Presbyterian Hospital; and Dr. George

Nager, Professor of Laryngology and Otology at Johns Hopkins.

2. The By-Laws of the Dutchess County Peer Review Committee state in pertinent part that the Chairman "shall forward . . . complaints to that member of the Committee to whose specialty a particular complaint most closely relates," which member "shall render an opinion on the complaint." They further state that the "complainant or his representative has the right to meet with the committee. . . ."

3. Plaintiff further alleges that defendant discussed plaintiff's situation with various Dutchess County physicians, and informally solicited their views. It is defendant's contention that although conversations did take place, they were completely unsolicited by him, and possibly prompted by plaintiff's own activities in publicizing the Committee's actions.

ular—those to Dr. Lawrence Savetsky, Assistant Professor of Clinical Otolaryngology at Columbia University and Chief of the Otolaryngology Clinic at Presbyterian Hospital,[4] and to Dr. George Nager, Professor of Laryngology and Otology at Johns Hopkins—contained material which, if not privileged, might well be deemed libelous.

Replies were ultimately received from Dr. Schuknect of the Massachusetts Eye and Ear Infirmary; Dr. Work, Chairman of the Department of Otorhinolaryngology at the University of Michigan; Dr. Daly, Professor of Otolaryngology at New York University; an unidentified individual at the Surgical Group of Poughkeepsie; and Doctors Savetsky and Nager. The letter from Dr. Daly—who stated that he knew plaintiff personally and may have had him as a student—was relatively positive in tone. The letter from Dr. Work was entirely neutral, containing only recommended charges for the operations in question. Responses from

Doctors Schuknect, Savetsky and Nager (only the latter two of whom were deposed), as well as that from the Poughkeepsie Surgical Group were mildly to severely critical of plaintiff's charges and surgical procedures.

Further meetings of the Peer Review Committee were held; and on March 16, 1976 fee recommendations were communicated to the insurance companies.

Two days later—on March 18, 1976—defendant wrote a letter to plaintiff which in effect summarized the activities of the Committee, and advised that the Committee's determination had been substantially unfavorable to plaintiff.[5] In addition, the letter contained the following statement now claimed to be libelous:

"Furthermore, the Committee is aware of the fact that a considerable number of your patients have not had a satisfactory result, based on follow-up experience of

---

**4.** Webster's New World Dictionary defines otolaryngology as "the branch or practice of medicine dealing with disorders of the ear, nose and throat."

**5.** The complete text of the March 18, 1976 letter is as follows:

"Dear Dr. Greenfield:
The Dutchess County Medical Society Peer Review Committee in its recent meeting on March 11, 1976, was able to make some decisions in your contested cases and matters pertinent thereto. I wish to apologize to you for the inordinately long time it has taken. However, it was the strong feeling of the committee that these decisions could be made only with the assistance and counsel of esteemed confreres in your specialty, with expertise and without bias. To this end, opinions were sought from the Department of Otorhinolaryngology at Columbia Presbyterian, Massachusetts Eye & Ear, the University of Michigan, the Johns Hopkins and N.Y.U. This took several months, and unfortunately the committee was not able to have any prior meetings this year.

"With regard to fees, only one of the consultants saw fit to support you. The others all felt that your fees were too high, and some were very forceful and unequivocal in so stating. With only one exception, they felt that the fee should not be materially influenced by your use of the microscope. The fees recommended fell within the following range:

| | |
|---|---|
| #26498 | $350 – $850 |
| #27946 | $350 – $800 |
| #26230 | $350 – $750 |

In view of the above, the committee supports the following fees:

| | |
|---|---|
| #26498 | $750 |
| #27946 | $700 |
| #26230 | $650 |

"With regard to your microsinal surgery, most of the consultants expressed strong feelings to the effect that the microscope was an encumbrance or at best a convenience to you. They were concerned about the indications for your surgery, and wondered whether most of these people had had an adequate trial on medical and/or allergic therapy. Certainly, for its proper evaluation, your procedure should be prospectively randomized and statistically evaluated in a locus with personnel without bias who would be capable to carrying out such a study. Concerns were also voiced with regard to your surgical judgment apropos the concomitant performance of clean and dirty procedures on the same patient. Furthermore, the committee is aware of the fact that a considerable number of your patients have not had a satisfactory result, based on follow-up experience of internists, allergists, neurologists and dentists.

"The committee looked with disfavor on your periodic lay press releases which could certainly be construed as promotional and further felt that correspondence from you which was threatening or harrassing was in poor taste.

"Sincerely,
"Bert Kanwit, M.D.
Chairman Peer Review Committee"

internists, allergists, neurologists and dentists."

This letter was dictated by defendant to the executive secretary of the Society—who, as its sole full-time employee, had attended all meetings of the Peer Review Committee at which plaintiff was discussed, and done all the secretarial work required to send out the letters to third-party consultants. So far as is known, no other person except plaintiff saw the March 18 letter.

Upon receipt of that letter, plaintiff informally sought access to the files of the Committee's investigation. Failing in that endeavor, he instituted against the instant defendant, the Peer Review Committee and the Dutchess County Medical Society an Article 78 proceeding in New York Supreme Court to obtain such access and in addition to secure a declaration that the Committee's "determination" was null and void. He successfully contested a motion to dismiss, the Court noting that there was a question as to whether or not the Committee was properly constituted and, further, that it was undisputed that the Committee had not followed its own rules with respect to the complaints received against plaintiff. Plaintiff was also apparently successful in securing access to the Committee's files, although he asserts that the instant defendant was guilty of bad faith and other improprieties in resisting his efforts. So far as we know, the Article 78 proceeding is still pending in state court, and no declaration of nullity has issued.

### The Instant Action

It is the plaintiff's claim that the activities of the Peer Review Committee, implemented by defendant, and allegedly undertaken at defendant's instigation, caused him acute emotional distress; severely damaged his professional reputation, forcing him to relinquish his Dutchess County practice and move to California; and compelled him to incur legal fees in prosecuting the Article 78 proceeding. With respect to emotional distress, plaintiff claims a temporary loss of sleep but points to no other manifestation of such distress.[6] As to the effect on his practice, he does not claim to have curtailed his surgery schedule (plaintiff's deposition at 154), and identifies no patients who refused him their custom nor doctors who declined him their reference following the Committee's actions.

Plaintiff asserts six claims for relief: (1) prima facie tort; (2) intentional infliction of severe emotional distress; (3) deprivation of due process under color of state law in violation of 42 U.S.C. § 1983; (4) reimbursement for attorney's fees incurred in the Article 78 proceeding; (5) libel per se; and (6) libel per se with malice.

The first four of these claims seek recovery for injuries said to have been incurred as a result of defendant's entire conduct beginning in April of 1975. However, because of the one-year statute of limitations in libel actions, the last two are predicated entirely upon the letter written on March 18, 1976.[7]

### Discussion

### Prima Facie Tort

To establish a cause of action for prima facie tort under New York law, one must

---

**6.** Thus, the transcript of plaintiff's deposition reads in part as follows (at 165):

"Question: Doctor, in paragraph number twenty of your Complaint you claim physical suffering as a result of this controversy and I'd like you to enumerate for us the physical suffering that you incurred.

"Answer: Well, at one point I had difficulty getting to sleep and I was very restless and I was fatigued for a short period of time, not quite knowing how to lick this. This is part of the walking around with the feeling that I had a great weight on my shoulders.

"Question: Were you treated for that?

"Answer: No, of course not.

"Question: You didn't even take aspirin?

"Answer: Not even an aspirin or a valium.

"Question: And that's the extent of the physical suffering?

"Answer: That's the extent. No physicians were consulted and no drugs were used and nobody was consulted. It all passed."

Plaintiff further admits that he in no way curtailed his physical activities or cut back on his personal life as a result of the Committee's action (plaintiff's deposition at 165–65).

**7.** See plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 35, and Affidavit in Opposition to Motion for Summary Judgment at 3.

demonstrate "the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful." *ATI, Inc. v. Ruder & Finn, Inc.* (1977) 42 N.Y.2d 454, 458, 398 N.Y.S.2d 864, 866, 368 N.E.2d 1230, 1232, *quoting Ruza v. Ruza* (1st Dep't 1955) 286 App.Div. 767, 769, 1 A.D.2d 669, 146 N.Y.S.2d 808, 811. "Underlying the question of excuse or justification . . . is the question of whether the public's gain outweighs the harm to another." *ATI, supra*, 398 N.Y.S.2d at 867, 368 N.E.2d at 1233.

The facts of *ATI* are particularly instructive. Plaintiff in that case manufactured aerosol products. Public controversy over the possible danger such products posed to the environment was heated, and culminated in the proposal of various federal regulations. Plaintiff accused defendants—two public relations firms—of seeking to extort money by first fanning that controversy and then—for a fee—offering to combat the adverse publicity they themselves had helped to create. The trial court granted a motion to dismiss the complaint before answer (and before discovery had been taken). The Court of Appeals affirmed. It held that since it was in the public interest to publicize the possibly injurious properties of plaintiff's product, it could not be concluded that defendants had acted "without justification", no matter how heinous their motives may have been.

█ Here, as chairman of the Peer Review Committee—whether or not such Committee was validly constituted—defendant had a duty both to the Committee and to the public to inquire into claims that a doctor was overcharging for his services. Such an inquiry would moreover seem to require consideration of the merits of the doctor's underlying procedures. It goes without saying that the public interest in economical and quality medical care is a social justification of the highest sort. *See ATI, supra*, 398 N.Y.S.2d at 867, 368 N.Y.S.2d at 1233. Despite exhaustive discovery, however, plaintiff has presented no evidence to impugn defendant's conclusion

(supported by the opinion—well-founded or not—not only of outside consultants, but of Dutchess County physicians deposed in this action) that plaintiff's procedures were—at the very least—controversial. Accordingly, even if we were to assume that defendant had transcended the legitimate bounds of his inquiry, or that his actions were motivated by malice, there would be no basis for a finding that he was liable in prima facie tort.

### Emotional Distress

█ Plaintiff likewise fails to state a cause of action for intentional infliction of severe emotional distress. Defendant's conduct during the period in question scarcely rises to that level of "extreme and outrageous" behavior exceeding "all bounds usually tolerated by decent society" which is required under New York law to establish such a claim. *Fischer v. Maloney* (1978) 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215; *Wiener v. Wiener* (2d Dep't 1981) 84 A.D.2d 814, 444 N.Y.S.2d 130; Restatement (Second) of Torts § 46(1); Prosser on Torts § 12, p. 56 (4th ed. 1971). *Cf. Kajtazi v. Kajtazi* (E.D.N.Y. 1978) 488 F.Supp. 15, 20 (upholding a claim for severe emotional distress brought by a mother whose child had been abducted and falsely imprisoned in a foreign country); *Johnson v. State* (1975) 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590, (permitting a daughter to recover for emotional distress caused by a state hospital's negligently misadvising her that her mother had died).

Nor, despite full discovery, has plaintiff shown any evidence of *severe* emotional distress. Plaintiff claims merely that he suffered minor loss of sleep and restlessness over a short period of time. Such a showing is inadequate for these purposes. *Cf. Long v. Beneficial Finance Co. of New York* (4th Dep't 1972) 39 A.D.2d 11, 330 N.Y.S.2d 664, 666 (where plaintiff sustained a heart attack and was unable to work again); *Halio v. Lurie* (2d Dep't 1961) 15 A.D.2d 62, 222 N.Y.S.2d 759, 761 (where plaintiff was unable to eat and digest food normally and was forced to seek medical aid).

*Deprivation of Due Process Under Color of State Law*

▮ Plaintiff's due process claim seems to us to founder on the requirement that the conduct at issue be under color of state law. We have read with interest the supplemental memoranda of the parties detailing the place occupied by the Peer Review Committee of the Dutchess County Medical Society in New York's statutory framework for regulation of the medical profession. We have similarly reviewed the cases cited by plaintiff (*Jackson v. Metropolitan Edison Co.* (1974) 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477; *Evans v. Newton* (1966) 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; *Burton v. Wilmington Parking Authority* (1961) 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; *Fitzgerald v. Mountain Laurel Racing, Inc.* (3d Cir. 1979) 607 F.2d 589, *cert. denied* (1980) 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814; *Janusaitis v. Middlebury Volunteer Fire Department* (2d Cir. 1979) 607 F.2d 17; *Perez v. Sugarman* (2d Cir. 1974) 499 F.2d 761; *Jackson v. Statler Foundation* (2d Cir. 1974) 496 F.2d 623, *cert. denied* (1975) 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397; *Ruffler v. Phelps Memorial Hospital* (S.D.N.Y. 1978) 453 F.Supp. 1062) in support of his contention that such regulation suffices to transform the actions of the Peer Review Committee—and hence of the instant defendant—into action under color of state law for purposes of stating a claim under 42 U.S.C. § 1983. *See also* the recent Supreme Court decisions of *Rendell-Baker v. Kohn* (1982) —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418; *Lugar v. Edmondson Oil Co.* (1982) —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482. A mere reading of the cases plaintiff cites and of the recent Supreme Court decisions—with their meticulous detailing of the evidence reflecting state involvement—is enough to demonstrate that there is no such involvement here.

The Dutchess County Medical Society is, and at all relevant times was, a private, not-for-profit corporation organized under the Not-For-Profit Corporation Law of the State of New York. It is a purely voluntary society, with no state funding. There is no requirement that a doctor join the Society in order to practice medicine in Dutchess County (or, for that matter, elsewhere in the state), *Ewald v. Medical Society of County of New York* (1st Dep't 1911) 144 App.Div. 82, 128 N.Y.S. 886; and although the Society has a right under § 1406(e) of New York's Not-For-Profit Corporation Law, to discipline its members as it sees fit, such discipline has no direct bearing on a doctor's right to practice medicine. Furthermore, the Society has no authority or control over any physician who chooses not to join.

As the plaintiff repeatedly emphasizes in his brief, the peer review system was undoubtedly inaugurated to forestall direct state action. That this endeavor has proven successful; and that the state has responded with occasional statutory references recognizing the existence and utility of that system [8] simply does not suffice to transform acts taken by members of a private voluntary society, operating in a traditionally private preserve, into action conducted under color of state law for purposes of a claim brought under 42 U.S.C. § 1983.

*Libel*

As above noted, the libel claims are predicated entirely on the letter of March 18,

---

**8.** Title 11–A of New York's Public Health Law, effective September 1, 1975, provides that physician members of the State Board for Professional Medical Conduct—the state regulatory body charged with overseeing the conduct of the medical profession—are to be appointed by the Commissioner of Health on recommendations made by, among others, county medical societies like the Dutchess County Medical Society. N.Y. Public Health Law § 230 subd. 1. (McKinney's 1981–82 Supp.) In addition, physicians suspecting, but reasonably unable to ascertain, that another physician is guilty of misconduct are authorized to refer the matter to their county medical society for investigation and report to the State Board, instead of reporting it directly to the State Board themselves. N.Y. Public Health Law § 230 subd. 11.(d). Finally, as previously indicated, New York's Education Law provides a qualified statutory privilege for actions taken by individuals serving on a peer review committee. N.Y. Education Law § 6527(3).

1976, the statute of limitations having run as to all prior letters. The basic question before us is whether or not the defendant has a valid defense of privilege with respect to that letter.

■■ New York extends a common law privilege to any communication made in the discharge of a private or public duty, whether legal or moral. *Shapiro v. Health Ins. Plan of Greater New York* (1959) 7 N.Y.2d 56, 194 N.Y.S.2d 509, 163 N.E.2d 333; *Byam v. Collins* (1888) 111 N.Y. 143, 19 N.E. 75. In the seminal statement of this rule, quoted both in *Shapiro,* 194 N.Y.S.2d at 512, 163 N.E.2d at 335, and *Byam,* 111 N.Y. at 150, 19 N.E. 75, the court in *Harrison v. Bush,* 5 Ellis & Black. [Q.B.] 344, stated:

> "A communication made *bona fide* upon any subject matter in which the party communicating has an *interest,* or in reference to which he has a *duty,* is privileged if made to a person having a corresponding *interest* or *duty,* although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation." (Emphasis in original.)

Applying this rule to the case at bar, it seems to us that regardless of whether or not the Peer Review Committee was properly constituted, defendant—as a member of the Dutchess County Medical Society—possessed a privilege to communicate to the executive secretary of that Society matters concerning another member's professional conduct. *See,* e.g., Seelman, Libel & Slander § 282.

· [6–8] While such a privilege is not absolute, it may be overcome only by a showing that the publication was motivated or actuated by actual malice. *Perfect Fit Industries v. Acme Quilting Co.* (S.D.N.Y. 1980) 494 F.Supp. 505; *Stillman v. Ford* (1968) 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 897, 238 N.E.2d 304, 306; *Shapiro, supra,* 194 N.Y.

S.2d at 513, 163 N.E.2d at 336. Under New York law, malice of the sort sufficient to overcome a qualified privilege consists of personal spite, ill will, or culpable recklessness or negligence. *Perfect Fit, supra,* 494 F.Supp. at 507; *Stillman, supra,* 290 N.Y. S.2d at 897, 238 N.E.2d at 306; *Hoeppner v. Dunkirk Printing Co.* (1930) 254 N.Y. 95, 106, 172 N.E. 139. Mere falsity is not enough, unless it is also shown that the defendant knew, or at least was culpably reckless in not knowing, that the statement was false. *See Rezey v. Golub Corp.* (3d Dep't 1979) 73 A.D.2d 772, 423 N.Y.S.2d 535, *aff'd* 52 N.Y.2d 713, 436 N.E.2d 264, 417 N.E.2d 558. Once a qualified privilege has been established, moreover, the burden of demonstrating malice is the plaintiff's. *Toker v. Pollak* (1978) 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 5, 376 N.E.2d 163, 167.

There is no basis in the instant record for a finding of recklessness. The question, therefore, is whether plaintiff has come forward with facts sufficient to establish that publication of the March 18 letter was motivated by personal spite or ill will.[9] We are not here concerned with whether defendant liked or disliked plaintiff, or with whether he conducted himself in an honorable fashion during the Committee's investigation or while defending himself against plaintiff's Article 78 proceeding. The sole question before us is the motivation behind the publication of this particular letter.

The stark fact which, it seems to us, requires a conclusion that such publication was not motivated by spite or ill will is that defendant disclosed this letter only to one human being other than plaintiff himself. This single human being was the executive secretary of the Peer Review Committee—a person without whose help the letter could not, as a practical matter, have been written; and one, moreover, who had previously been privy to all actions by and communications to or from the Committee touching on plaintiff's affairs. There is no suggestion in the record that this secretary had any

---

**9.** Clearly there would be no claim of libel if defendant had typed the letter himself and handed it to plaintiff. So the claim, if any, must arise out of the publication to the secretary.

relationship with plaintiff, or that her opinion of him—whether good or ill—had any importance either to him or to defendant. In the circumstances, it simply defies belief that, had defendant been bent on injuring plaintiff's reputation, he would have scrupulously confined communication of the March 18, 1976 letter to this single human being.

Plaintiff argues that the jury, in assessing defendant's state of mind on March 18, 1972, would be entitled to consider everything he said or did during the entire course of the controversy with plaintiff. This argument is wholly valid. However we hold, as a matter of law on all the evidence before us, that nothing defendant did or said would suffice to overcome the effect of the scrupulous restraint he exhibited on March 18, 1976 in confining publication of the alleged libel to this particular human being. Were a jury to find that such publication had been motivated by spite or ill will, we would set the verdict aside and grant judgment notwithstanding the verdict. We accordingly hold, as a matter of law, that malice cannot be established on the record before us.

*Attorneys Fees*

There remains only plaintiff's claims for attorney's fees incurred in the Article 78 proceeding. It is the general rule in New York, as elsewhere, that in the absence of statutory or contractual liability, attorney's fees may not be recovered. *City of Buffalo v. J. W. Clement Co.* (1971) 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895; *Tucker v. Toia* (4th Dep't 1978) 64 A.D.2d 826, 407 N.Y.S.2d 600.

Plaintiff seeks to avoid the effects of this doctrine by arguing that the expenditure of attorney's fees on the Article 78 proceeding was an inevitable result of defendant's "tortious conduct" (plaintiff's memorandum of law in opposition to defendant's motion for summary judgment). Our holding that plaintiff has failed to establish a claim for tortious conduct vitiates this argument. Accordingly, plaintiff's request for attorney's fees must be denied.

*Conclusion*

For the above-stated reasons, the complaint is dismissed.

SO ORDERED.