**Israel OLIVIERI, Plaintiff,**

v.

**McDONALD'S CORPORATION, Defendant.**

**No. 86 CV 2638.**

United States District Court, E.D. New York.

Jan. 26, 1988.

Wechsler & Wechsler, P.C. by Robert E. Wechsler, Lawrence Wechsler, Great Neck, N.Y., for plaintiff.

Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill. by Alan H. Silberman and Hunton & Williams by J. Nicholas Suhr, Mark Waterson, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant moves this Court for summary judgment, pursuant to Federal Rule of Civil Procedure 56, for an order dismissing the complaint on the ground that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.

On July 8, 1986, plaintiff Olivieri commenced this action in the Supreme Court of the State of New York, County of Queens, by service of a summons and complaint on the New York Secretary of State pursuant to section 306 of the New York Business Corporation Law. A timely removal petition was filed in this Court on August 7, 1986. The complaint alleged four causes of action: violation of New York General Business Law section 687, fraudulent misrepresentation, negligent misrepresentation, and injurious falsehood. The plaintiff has withdrawn the cause of action for negligent misrepresentation.

FACTS

McDonald's Corporation (McDonald's) represents a world-wide system of restaurants. It owns some of the restaurants, but the majority are franchised to individuals selected by the corporation. McDonald's has established a program for selecting future franchisees. The program combines classroom, self-directed, and on-the-job training. Each applicant is required to spend a substantial amount of time (usually 1000 plus hours) in a McDonald's restaurant learning the system of operation and day-to-day management techniques. McDonald's contends that one of the purposes of the length of the program is to enable the franchise candidate and McDonald's to evaluate each other in preparation for a business relationship that is intended to last for twenty years.

McDonald's reserves the right to terminate the program of a particular potential franchisee at any time. Every franchisee is alerted to that fact. For example, on September 27, 1984, Olivieri signed an agreement to return all McDonald's training materials. The agreement included an

acknowledgement that his work for McDonald's as part of the training program did not commit McDonald's to award him a franchise. Also, every franchise applicant signs a written agreement by which s/he acknowledges that s/he understands that McDonald's is not making a commitment to sell him/her a franchise merely by accepting him/her into the training program. Olivieri signed such an agreement on July 1, 1985, when he entered the McDonald's program. In addition, on July 19, 1985, Olivieri acknowledged receipt of the New Jersey Franchise Offering Circular for Prospective Franchisees. That acknowledgement stated that no one had made any promises or assurances to the candidate that a franchise would be granted to him and acknowledged that no franchise would exist without a written agreement. However, in his deposition taken in connection with this action on October 29, 1986, Olivieri stated affirmatively that he had not read the prospectus or any other papers given to him by McDonald's in connection with the prospective franchise. Deposition of Israel Olivieri, at 13–14 (Oct. 29, 1986).

Olivieri participated in the franchise program for nearly three years. McDonald's claims that Olivieri was told that he would have to successfully complete the McDonald's program and that he would be continually evaluated during the program. Olivieri agrees that he was told that he would have to successfully complete the program to be considered for a franchise; however, he contends that the requirements of the program were never made clear to him and were changed from a requirement that he complete the Basic Operations Course to a requirement that he complete the Intermediate Operations Course.

John Baratta, a National Field Licensing Manager for McDonald's, stated in his affidavit in support of this motion that Olivieri completed the initial period successfully, but that his progress slowed when he began the self-directed program. Further, Baratta stated that he became concerned about Olivieri's attitude as he progressed through the program. Baratta and Dwight Miller, McDonald's Operations Manager for the Connecticut Market, met with Olivieri in October 1984 with the intention of terminating him from the program, because of his "attitude, lack of initiative, and poor rate of progress in his training." Affidavit of John Baratta in Support of McDonald's Corporation's Motion for Summary Judgment, at 7 (Sept. 17, 1987). In contrast, Olivieri contends that he was never given reason to believe that he was not progressing satisfactorily in the program. Affidavit of Israel Olivieri in Opposition to Motion for Summary Judgment, at 2 (Nov. 3, 1987).

In November 1985 McDonald's decided to terminate Olivieri from its training program. The decision was based, in part, on Olivieri's interview with Ruth Anderson, at that time McDonald's Licensing Manager for the Fort Lauderdale Region. As a result of the interview, McDonald's officers decided that Olivieri was not an individual with whom it wanted to enter into a twenty-year business relationship.

Since the memo resulting from this interview is the basis for Olivieri's claim of injurious falsehood, the details are relevant. (Memo is attached to this Memorandum as Appendix A.) On November 5, 1985, Ruth Anderson reported to Dwight Miller about the October 24, 1985, interview with Olivieri. The purpose of the interview was to evaluate Olivieri for a franchise in Puerto Rico in 1986. Anderson stated that her perception of Olivieri prior to the interview was positive in that she viewed "[h]is application ... as solid and his training level appeared to be very good...." According to the memo, Anderson told Olivieri during the interview that McDonald's had made no commitment to give him a restaurant. Anderson was extremely disappointed in Olivieri's performance during the interview. She concluded that his attitude was poor and that he had not learned sufficient management or other skills during his training to run a McDonald's franchise. Plaintiff contends that the Anderson memo inaccurately represented the meeting. He stated that only general matters were discussed and that there were no technical discussions of Mc-

Donald's systems. Olivieri Affidavit, at 2. Anderson reported that Olivieri repeatedly answered questions in a flip manner; plaintiff contests this and states that Anderson's report is false.

Olivieri was terminated when McDonald's officers concluded that he demonstrated no ability to become a McDonald's franchisee. In particular, it alleged that he could not run a shift or schedule employees, that he was not familiar with profit and loss statements, and that he was progressing very slowly on the self-directed part of the training program. Further, McDonald's alleged that Olivieri had no initiative, no spirit of cooperation, or appreciation for the McDonald's system. Baratta Affidavit, at 8.

DISCUSSION

Federal Rule of Civil Procedure 56 allows a Court to grant summary judgment when there is no dispute of material fact and the moving party is entitled to judgment on the law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Supreme Court has recently expanded the concept of summary judgment. *See Celotex,* 477 U.S. 317, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A mere dispute of fact is insufficient to bar summary judgment. The disputed fact must be genuine in that if it were interpreted in the manner most favorable to the nonmoving party, summary judgment would be inappropriate. *Matsushita,* 106 S.Ct. at 1356. Although there are disputed facts in the present case, none of them, if interpreted in favor of plaintiff, is of sufficient materiality to warrant a trial.

*Claim Under the Franchise Sales Act*

Olivieri's first claim is that McDonald's violated the New York Franchise Sales Act. N.Y.Gen.Bus.L. § 687 (McKinney's 1984).[1] Article 33 of the New York General Business Law sets forth the statutory scheme for franchise regulation in New York. The statute was enacted to curb abuses and regulate the franchisor-franchisee relationship. *Id.* at § 680. The statute sets forth extensive disclosure requirements for franchisors. *See id.* at § 683. However, larger, established franchisors are exempted from registration requirements, *id.* at § 684, because they are more likely to be financially accountable. Kaufmann, *Practice Commentary to Article 33* at 591. Franchisors with a net worth of between five and fifteen million dollars must apply for an exemption, N.Y.Gen.Bus.L. § 684(2), while franchisors with a net worth over fifteen million dollars are automatically exempted from the registration requirements, *id.* at § 684(3). This exemption is only from the registration provisions; franchisors still must supply the information required by the statute to be disclosed in the prospectus. Kaufmann, *Practice Commentary to Article 33* at 592 and Kaufmann, *1985 Supplementary Practice Commentary* at 71 (McKinney's 1988 Supp.).

In addition, section 687(2) makes it unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly: .

. . . .

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . .

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Exemption from the registration provisions does not include exemption from the anti-fraud provision.

Finally, the statute provides a limited private right of action to the person purchasing a franchise. *Id.* at § 691(1). Section 691 imposes liability on a person who offers or sells a franchise that violates section 683, 684, or 687 for damages or, if

---

1. All references to N.Y.General Business Law are to McKinney's 1984 edition unless otherwise noted.

the violation is willful and material, rescission. *Id.* However, no civil remedy is available if the franchisor has offered to refund the consideration to the aggrieved person prior to the institution of the suit. *Id.* at § 691(2).

■ As a preliminary matter, McDonald's is automatically exempt from registration requirements under the Franchise Sales Act, but is not, as it contends, exempt from the disclosure requirements or fraud provisions. Thus, even if McDonald's has no obligation to register its prospectus, it must furnish the same information to prospective franchisees as must be disclosed in a registered prospectus. Kaufmann, *Practice Commentary to Article 33* at 592. The Federal Trade Commission's Franchising Rule requires similar disclosure. *See* 16 C.F.R. § 436 (1987).[2] Additionally, since the fraud provisions of the Franchise Sales Act cover untrue statements or material omissions in connection with the offer, sale or purchase of *any* franchise, *see* N.Y.Gen. Bus.L. § 687(2), the McDonald's prospectus is not exempt from those provisions. McDonald's contention that its prospectus is not covered by section 687 is incorrect.

■ Notwithstanding the above, plaintiff's claim under the Franchise Sales Act fails for several reasons. First, the Franchise Sales Act does not require disclosure of the requirements for becoming a franchisee other than the financial requirements. *See* N.Y.Gen.Bus.L. § 683. However, each registered franchise prospectus must contain a "representation that the registered prospectus does not knowingly omit any material fact or contain any untrue statement of a material fact." *Id.* at § 683(2)(s). Since an exempt prospectus must conform to the disclosure requirements, this subsection must also apply. Consequently, although there is no need to disclose the nonfinancial requirements for

becoming a franchisee, any statement concerning such requirements must be true and not misleading.

In fact, the representations made in the McDonald's prospectus concerning the training program indicate that it is a fluid program, constantly being revised. It indicates that much of the training takes place in the field. There is no promise that an applicant will participate in any particular course at Hamburger University except the Advanced Operations Course just prior to the opening of the franchisee's restaurant. When compared to the realities of the training program, this description is not false or misleading.

Second, Olivieri contends that he was injured by his reliance on the "misleading" prospectus. However, Olivieri admitted in his deposition that he did not read the prospectus.[3] He may not claim that he was injured by his reliance on the description of the training program.

■ Finally, Olivieri does not have a right to sue under the statute for only a purchaser may sue for damages. *See* N.Y. Gen.Bus.L. § 691(1); *see also Carlucci v. Owens–Corning Fiberglass Corp.,* 646 F.Supp. 1486, 1495 (E.D.N.Y.1986) (A person who has not paid a franchise fee has no cause of action under the Franchise Sales Act.) In fact, if a franchisor has offered to refund the consideration with interest before a suit is filed, then no suit may be filed or maintained. *Id.* at § 691(2). The statute is intended to prevent franchisees from being defrauded financially. *See* Kaufmann, *Practice Commentary to Article 33* at 588. Olivieri has not lost any money; he has only lost the prospect of profits were he to become a McDonald's franchisee.

In sum, Olivieri does not have a claim under the Franchise Sales Act. The prospectus was not misleading, he did not rely

**2.** Several courts have concluded that there is no private right of action under the Federal Trade Commission Rule. *Mon–Shore Management, Inc. v. Family Media,* No. 83 Civ. 2013 (S.D.N.Y. Dec. 23, 1985) [Available on WESTLAW, 1985 WL 4845] (LEXIS, Genfed library, Dist file); *Freedman v. Meldy's Inc.,* 587 F.Supp. 658 (E.D. Pa.1984); *Chelson v. Oregonian Publishing Co.,*

1981–1 Trade Case (CCH) ¶ 64,031, at 76, 336–37 (D.Ore.1981).

**3.** From the standpoint of plaintiff's competence to manage, his claim that he had not read the prospectus or any other papers given to him by McDonald's certainly does little to help his case.

on it, and he does not have a civil remedy under the statute.

*Fraud Claim*

■ Since Olivieri has dropped his claim for negligent misrepresentation, only his claim for fraudulent misrepresentation remains. Olivieri claims that McDonald's employees promised him that if he completed the training program satisfactorily he would be able to purchase a McDonald's franchise. He contends that McDonald's had no intention of keeping the promise at the time it was made and the promise was, therefore, fraudulent.

In New York, statements involving future promises are not actionable as fraud unless a plaintiff can show that defendants had no intention of carrying them out at the time the promise was made. *Giblin v. Murphy*, 97 A.D.2d 668, 670, 469 N.Y.S.2d 211, 214 (3d Dept.1983). The failure to fulfill a promise is not enough to prove fraud. *Id.* A mere showing of nonperformance does not suffice as proof of fraud under New York law; a plaintiff must prove that the promise was made with the intention not to carry it out. *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 576 (2d Cir.1969); *Brignoli v. Balch Hardy & Scheinman, Inc.,* 645 F.Supp. 1201, 1208 (S.D.N.Y.1986); *Soper v. Simmons International, Ltd.,* 632 F.Supp. 244, 249 (S.D.N.Y.1986); *Margate Industries, Inc. v. Samincorp, Inc.,* 582 F.Supp. 611, 619 (S.D.N.Y.1984). Olivieri has not shown any intent on the part of McDonald's at the time he began the course not to award him a franchise. McDonald's, on the other hand, has submitted affidavits stating it considered Olivieri a serious franchise candidate. Under Federal Rule of Civil Procedure 56, Olivieri has failed by his affidavit to show that there is a genuine issue of fact as to McDonald's intent to defraud him.

Additionally, a plaintiff must show justifiable reliance on the promise that he contends defendants made with no intention of performance. *Lester v. Pickwick International, Inc.,* 528 F.Supp. 1011, 1012–13 (E.D.N.Y.1981). Since Olivieri signed a series of documents acknowledging that McDonald's had made no commitment to award him a franchise, that as noted above he did not bother to read, he may not contend that he *justifiably* relied on any oral promise to offer him a franchise.

Further, a plaintiff must prove fraud by clear and convincing evidence. *Id.* at 1013. Olivieri has merely requested that this Court infer that an oral promise to award him a franchise was breached from the fact that he was not awarded a franchise. The lack of sufficient evidence to prove justifiable reliance makes summary judgment particularly appropriate. *Perma Research,* 410 F.2d at 577; *Margate Industries,* 582 F.Supp. at 619–20; *Lester,* 528 F.Supp. at 1013. Olivieri has not submitted sufficient proof to show that McDonald's never intended to award him a franchise. He has merely shown that they refused to award him one. Summary judgment on this claim is therefore appropriate.

*Injurious Falsehood*

In his final outstanding cause of action, plaintiff claims that he was defamed in the memorandum dated November 5, 1985, sent by Ruth Anderson to Dwight Miller and John Baratta. (Appendix A.) In the memo Anderson described her meeting with plaintiff and explained why she considered him unqualified for a McDonald's franchise. The memo does contain uncomplimentary statements about plaintiff that Olivieri contends are untrue.

Under New York law, a communication made by a person with an interest or duty to make the communication and sent to a person with a corresponding interest or duty is protected by a qualified privilege, even though without the privilege the communication would be "slanderous and actionable." *Byam v. Collins,* 111 N.Y. 143, 150, 19 N.E. 75 (1888); *see also Angrisani v. City of New York,* 639 F.Supp. 1326, 1335–36 (E.D.N.Y.1986); *Greenfield v. Kanwit,* 546 F.Supp. 220, 227 (S.D.N.Y.), *aff'd,* 714 F.2d 113 (2d Cir.1982); *Shapiro v. Health Insurance Plan of Greater New York,* 7 N.Y.2d 56, 60–61, 194 N.Y.S.2d 509, 512–13, 163 N.E.2d 333, 335–36 (1959). The privilege is a qualified one limited to statements made pursuant to the duty and

that the writer believes to be true. *Shapiro,* 7 N.Y.2d at 61, 194 N.Y.S.2d at 513, 163 N.E.2d at 336. It is well established that the privilege applies to reviews or evaluations of the performance of an employee by superiors. *Kasachkoff v. City of New York,* 107 A.D.2d 130, 134, 485 N.Y.S.2d 992, 996 (1st Dept.), *appeal dismissed,* 65 N.Y.2d 722, 492 N.Y.S.2d 28, 481 N.E.2d 568 (1985), *appeal dismissed in part,* 67 N.Y.2d 645, 499 N.Y.S.2d 683, 490 N.E.2d 549, *affirmed,* 68 N.Y.2d 654, 505 N.Y.S.2d 67, 496 N.E.2d 226 (1986). Further, the privilege may be "overcome only by showing that the publication was motivated or actuated by actual malice," *Angrisani,* 639 F.Supp. at 1337; *Greenfield,* 546 F.Supp. at 227, for the privilege negates any presumption of implied malice and shifts the burden onto the plaintiff to show actual malice, *Schwartzberg v. Mongiardo,* 113 A.D.2d 172, 175, 495 N.Y.S.2d 269, 271 (3d Dept.1985). To establish malice under New York law so as to overcome a qualified privilege, a plaintiff must show "personal spite, ill will or culpable recklessness or negligence." *Greenfield,* 546 F.Supp. at 227.

■ In the present case, Anderson's memo to her fellow employees falls directly under the qualified privilege. She had a duty as a McDonald's employee to interview Olivieri and write an evaluative memo about him as a prospective franchisee. She sent the memo to Miller and Baratta, who shared her interest in and duty to evaluate Olivieri. The evaluation was not published beyond the circle of McDonald's employees necessary to make the franchise determination. Further, no malice may be inferred from the memo itself or the surrounding circumstances. Anderson stated at the beginning of the memo: "I give the foregoing [positive remarks] to indicate that I went into the interview with a *positive* bias! In fact I was really pulling for Israel [Olivieri]!" Anderson Memorandum dated November 5, 1985, Exhibit G to Plaintiff's Opposition to Motion for Summary Judgment (emphasis in original). Additionally, Anderson had not met Olivieri prior to the interview. He had been recommended to her by other McDonald's officers as a prospective franchisee. She had no reason to express ill will or malice toward him.

The mere fact that a statement is false does not create a factual issue that malice exists. *Kasachkoff,* 107 A.D.2d at 135, 485 N.Y.S.2d at 996. A plaintiff may not rely on surmise and speculation to show a factual issue as to malice. *Id.* Thus, even if Anderson's memo is false, Olivieri has not shown that it was made with malice. Defendant must be granted summary judgment on this claim as well as the claim under the Franchise Sales Act and the fraud claim.

Accordingly, summary judgment is hereby granted to defendant in accord with the above memorandum.

SO ORDERED; submit judgment with costs, on notice.

APPENDIX A 11/5/85

TO: DWIGHT MILLER
 LICENSING MGR.
FROM: RUTH ANDERSON
 LICENSING MGR.
RE: ISRAEL OLIVIERI

TERRY LOVELACE AND I HAD AN INTERVIEW WITH ISRAEL OLIVIERI ON OCT. 24 IN SAN JUAN, PUERTO RICO. ACCOMPANYING HIM WAS HIS FIANCE.

THE PURPOSE OF THE INTERVIEW WAS TO DETERMINE IF ISRAEL WOULD BE AN OUTSTANDING CANDIDATE FOR A NEW STORE OPPORTUNITY IN PUERTO RICO DURING '86 — PERHAPS AS EARLY AS APRIL. ON PAPER IT LOOKED POSITIVE — ISRAEL HAS WANTED P.R. FROM THE BEGINNING. HIS FAMILY IS IN P.R., HE OWNS PROPERTY THERE, ETC. HIS APPLICATION CERTAINLY IS SOLID AND HIS TRAINING LEVEL APPEARED TO BE VERY GOOD FROM MY CONVERSATION BY PHONE WITH ISRAEL — BOC AND IOC COMPLETED, IN TRAINING 3 YRS, WORKING 25 HRS. PER WEEK IN THE STORE, ATTENDING APPLICANT MTGS., ETC.

I GIVE THE FOREGOING TO INDICATE THAT I WENT INTO THE INTERVIEW WITH A <u>POSITIVE</u> BIAS! IN FACT, I WAS <u>REALLY</u> PULLING FOR ISRAEL!

VERY EARLY IN THE INTERVIEW ISRAEL STATED THAT HIS INSURANCE BUSINESS IS FOR SALE. I ASKED HIM WHY. HE TOLD US THAT HE HAD BEEN IN TRAINING A LONG TIME, AND IT WAS TIME FOR HIM TO BE GETTING A STORE. I REMINDED HIM THAT THERE IS NEVER A COMMITMENT FROM McDONALD'S AND THAT A STORE OFFER IS NOT TIME–BASED. HE SAID THAT McDONALD'S WAS NOT GOING TO BE ABLE TO HAVE 20 PEOPLE HANGING AROUND FIVE YEARS AND NOT GIVE THEM A STORE. (THE 20 ARE TRAINING IN THE N.Y. REGION.) _____ VOICED HER AGREEMENT. I TOLD ISRAEL THAT ON BEHALF OF THE LICENSING DEPT. AND McDONALD'S CORP. I WANTED TO STATE CLEARLY THAT WE DO <u>NOT</u> WANT HIM TO SELL ANYTHING BASED ON GETTING A McDONALD'S RESTAURANT. HE SAID THAT HE'D BEEN TOLD THAT BEFORE BUT REITERATED THERE WAS NO WAY HE WOULDN'T GET A McDONALD'S. I ONCE AGAIN TOLD HIM THERE IS A POSSIBILITY HE WON'T. WE MOVED ON.

WITHIN THE NEXT FIVE MINUTES ISRAEL SAID HE WANTED TO GO TO A GROWTH AREA SO HE WOULD BE ABLE TO GET ADDITIONAL STORES TO KEEP HIS MORALE UP. AT FIRST I THOUGHT ISRAEL WAS JOKING, BUT HE WASN'T.* I INFORMED HIM THAT McDONALD'S DOESN'T AWARD STORES JUST TO KEEP MORALE HIGH. HE STARTED TO ARGUE SO I ASKED HIM TO LET ME EXPLAIN THE EXPANSION CRITERIA. HE SAID HE WAS NOT AWARE OF THIS. I TOLD HIM THAT WE TALK ONLY IN TERMS OF ONE STORE — THAT MANY PEOPLE WON'T GET THE FIRST AND MANY WILL NOT GET THE SECOND.

THIS INTERVIEW WAS THE WORST I HAVE HAD. IT WAS LIKE A TUG OF WAR. ISRAEL WOULD GET VERY ENTHUSIASTIC WHEN TALKING ABOUT NILES SHOES OR INSURANCE — HE COULD GET SPECIFIC, CITE STANDARDS, TALK VOLUME, SALES BUILDING, ETC. OUR PROBLEM WAS THAT WE COULDN'T GET HIM TO TALK <u>Mc</u>-DONALD'S. WHEN WE WOULD FINALLY GET HIM RE–FOCUSED HE WOULD GIVE A BRIEF, SHALLOW RESPONSE AND REVERT TO HIS COMFORT ZONE.

WHEN ASKED WHAT QUALIFIES HIM TO OWN A McDONALD'S:

1. I CAN COOK, BUT I COULD COOK BETTER IF THE TRNG. CONSULTANT WOULD DO "SOME LITTLE PAPERS" ON ME — "I ASKED HIM LAST WK. IF HE WOULD." ISRAEL LATER REMEMBERED TERMINOLOGY (SOC'S).

2. I CAN WORK ON THE MACHINERY.

③ I HAVE DESIRE. I WOULD LIKE TO BRING SOME N.Y. AGGRESSIVENESS TO THIS MKT. (P.R.)

* HE TOLD ME THAT HE <u>KNOWS</u> McDONALD'S GIVES OTHER STORES TO KEEP MORALE UP.

SINCE IT WAS OBVIOUS ISRAEL COULD NOT TELL US WHAT HE CAN DO, WE STARTED THROWING OUT POSSIBILITIES:

① RUN SHIFTS? NO — CAN'T DO IN SOMEBODY ELSE'S STORE.

② SCHEDULING? DID <u>A</u> MOCK SCHEDULE AS PREREQUISITE FOR I.O.C. — NOT AN ACTUAL ONE.

③ BUILD—TO? STORE NEEDS ONE (ALWAYS RUNNING OUT). WHY DON'T YOU DO ONE? THEY WOULDN'T LIKE IT.

④ CONTROL A P&L? I'VE NEVER SEEN ONE.

⑤ WHAT IS FOOD COST IN YOUR STORE? 26% WHAT IS IMPACT ON PRODUCT MIX BY McDLT? UNKNOWN. PERCENT OF SALES? UNKNOWN.

⑥ STATS? I'VE WATCHED SOMEBODY WORK PART OF ONE. HAVE YOU ANALYZED STAT? NO.

⑦ INVENTORY? I CAN INVENTORY MOST OF THE THINGS.

⑧ P.M. CALENDAR? NO. HE <u>HAD</u> USED A SCREWDRIVER TO FIX SOMETHING ON A TOASTER.

**1004**

⑨ MONTH END? WHAT IS IT?!

SOMETHING THAT MADE MY HEART "STOP" WAS ISRAEL'S ATTITUDE TOWARD PERSONNEL PRACTICES. WHEN I TOLD HIM STAND–BY TIME AND REQUIRED VIEWING OF TRAINING FILMS WHILE OFF THE CLOCK WERE ILLEGAL,⊛ HE SAID THAT HE KNEW THAT BUT YOU JUST HAVE TO GET YOUR CREW TO COOPERATE. "AFTER ALL, THAT'S WHAT IT'S ALL ABOUT — COOPERATION."

⊛ ISRAEL HAD MENTIONED THESE AS WAYS HE WOULD CONTROL LABOR COSTS AND UPGRADE TRNG. LEVEL.

SOMETHING ELSE THAT WAS NOTICEABLE TO ME WAS THAT ISRAEL DID NOT HAVE ANYTHING COMPLIMENTARY TO SAY ABOUT HIS TRNG. STORE,** PEOPLE WHO'VE BEEN WORKING WITH HIM, ETC. HE WASN'T NEGATIVE — JUST NOT POSI-TIVE. BY NOW I WOULD HAVE EXPECTED STRONG BONDS WITH <u>SOMEBODY</u>.

** DID SAY STORES IN QUEENS ARE IMMACULATE.

I WAS DISAPPOINTED THAT ISRAEL HAD BEEN IN P.R. 24 HRS. BEFORE OUR IN-TERVIEW BUT HAD NOT BEEN TO A McDONALD'S NOR WAS HE PLANNING TO GO THE DAY WE MET. I HAD TAKEN HIS REQUEST TO HAVE THE INTERVIEW IN P.R. AS A SIGN THAT HE WANTED TO "SCOUT OUT" THE STORES, ETC. HE WAS OBVI-OUSLY THERE TO VACATION NOT AS A BUSINESS PERSON.

WHEN TERRY ASKED HIM IF THERE WERE ANY QUESTIONS, HE SAID, "WHEN DO I COME AND WHEN WILL I GET MY SECOND STORE?" I STARTED TO ANSWER, AND ISRAEL STARTED TALKING. THAT WAS WHEN TERRY GOT ON THE EDGE OF HIS CHAIR AND ASKED, "DID YOU HEAR THE ANSWER?" I TOLD ISRAEL THAT I WOULD GET BACK WITH YOU AND TOLD HIM AGAIN THAT I DON'T TALK ABOUT STORE #2.

ISRAEL CONCLUDED BY SAYING HE WOULD ALSO GO TO SARASOTA WHERE HE HAS A NICE PIECE OF PROPERTY.

THE INTERVIEW LASTED TWO HOURS.

ISRAEL WILL NOT BE PLACED IN THE TWO FLORIDA REGIONS NOR THE TWO REGIONS IN TEXAS. DWIGHT, I HOPE THIS RECAP WILL HELP YOU EVALUATE ISRAEL'S CANDIDACY TO SEE IF IT IS MUTUALLY BENEFICIAL FOR US TO CONTINUE.

CALL IF YOU HAVE QUESTIONS.

RUTH ANDERSON
11/5/85