**UNITED STATES of America, Plaintiff,**

v.

**Mark SHARP d/b/a Sharp Grocery, Loethen Oil Company Inc., Kerr-McGee Corporation and Kerr-McGee Refining Corporation, Defendants.**

**No. 84–0701–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

June 18, 1986.

Vernon A. Poschel, Asst. U.S. Atty., Kansas City, Mo., F. Henry Habicht, II, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Brian G. Donohue, Atty., Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., Marcia Ginley, Atty. U.S.E.P.A., Denver, Colo., for plaintiff.

Robert L. Hyder, Jefferson City, for Loethen Oil Co., Inc.

Karl F. Schmidt, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for Kerr McGee & Kerr McGee Refining; Thomas R. Cochran, Senior Counsel, Kerr-McGee Chemical Corp., Oklahoma City, Okl., of counsel.

## MEMORANDUM ORDER

BARTLETT, District Judge.

Plaintiff seeks to recover civil penalties from defendants Mark Sharp d/b/a Sharp Grocery, Loethen Oil Company, Inc., Kerr-McGee Corporation and Kerr-McGee Refining Corporation for a violation of the unleaded gasoline regulations, 40 C.F.R. § 80.1, *et seq.*, adopted pursuant to § 211(c) of the Clean Air Act, 42 U.S.C. § 7545(c). Plaintiff seeks a civil penalty of $10,000 for each day the violation continued pursuant to § 211(d) of the Clean Air Act, 42 U.S.C. § 7545(d), and 40 C.F.R. § 80.5.

On June 11, 1986, a consent judgment was entered against defendants Mark Sharp d/b/a Sharp Grocery and Loethen Oil Company.

### The Violation

Title 40 C.F.R. § 80.22(a) prohibits any retailer from selling or offering for sale gasoline represented to be unleaded unless the gasoline meets the requirements of § 80.2(g). "Unleaded gasoline" is defined in § 80.2(g) as "gasoline which is produced without the use of any lead additive and which contains not more than 0.05

gram of lead per gallon and not more than 0.005 gram of phosphorus per gallon." A "retailer" is defined in § 80.2(k) as "any person who owns, leases, operates, controls, or supervises a retail outlet."

On April 27, 1981, Mark Sharp d/b/a Sharp Grocery, Highway 7, Pleasant Hill, Missouri (hereafter Sharp), was a "retailer" as defined in § 80.2(k). On April 27, 1981, inspectors employed by the Environmental Protection Agency (EPA) sampled gasoline from the two gasoline pumps at Sharp marked "unleaded." Analysis revealed that the gasoline samples taken from both pumps contained .18 gram of lead per gallon of gasoline. The unleaded gasoline sampled by the EPA on April 27, 1981, was offered for sale by Sharp. Therefore, on April 27, 1981, Sharp offered for sale gasoline represented to be unleaded containing more than .05 gram of lead per gallon in violation of § 80.22(a).

### Duration of Violation

■ Prior to the inspection by EPA on April 27, 1981, the last gasoline delivery to Sharp had been a delivery of leaded gasoline on April 21, 1981. No delivery of gasoline, either leaded or unleaded, was made to Sharp from April 21, 1981, to May 6, 1981. Each day from April 21, 1981, to May 6, 1981, gasoline represented to be unleaded was offered for sale at Sharp. Therefore, from April 21, 1981, to May 6, 1981, Sharp offered for sale gasoline represented to be unleaded containing more than .05 gram of lead per gallon in violation of § 80.22(a).

### Defendants' Responsibility for the Violation

■ Title 40 C.F.R. § 80.23(a)(1) provides in part as follows:

Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries appears on the pump stand or is displayed at the retail outlet or wholesale purchaser-consumer facility from which the gasoline was sold, dispensed, or offered for sale, ... such

gasoline refiner shall be deemed in violation [of § 80.22(a)].

A "refiner" is defined in § 80.2(i) as "any person who owns, leases, operates, controls, or supervises a refinery."

From April 21, 1981, to May 6, 1981, defendants Kerr-McGee Corporation and Kerr-McGee Refining Corporation were "refiners". (Hereafter the defendants will be referred to as "Kerr-McGee.")

A "retail outlet" is defined in § 80.2(j) as "any establishment at which gasoline is sold or offered for sale for use in motor vehicles." Sharp was a retail outlet from April 21, 1981, to May 6, 1981.

Loethen Oil Company was the owner of the pumps and storage tanks at Sharp and the distributor supplying gasoline to Sharp. Donald Loethen, treasurer of Loethen Oil Company, testified that a Kerr-McGee sign was at Sharp and that the pumps were marked with the Kerr-McGee logo. Loethen testified that the Kerr-McGee identification was at Sharp "continuously" from 1974 to November 9, 1984. Also, EPA inspector Kellerstrass testified credibly that on April 27, 1981, Kerr-McGee identification was on display at Sharp. Therefore, from April 2, 1981, to May 6, 1981, a Kerr-McGee "corporate, trade or brand name" was displayed at Sharp.

The conclusion that Kerr-McGee signs were displayed at Sharp is entirely consistent with the agreements between Kerr-McGee and Loethen Oil Company and between Loethen and Sharp. Pursuant to these agreements, Sharp should have been displaying appropriate signs and other advertising media indicating that Kerr-McGee products were being sold.

Mark Sharp testified that he was not certain the "Kerr-McGee" sign was hanging on April 27, 1981. Sharp's inability to remember whether the sign was there on any particular day is on the one hand not surprising in view of the time that has elapsed and on the other hand understandable in view of his self-interest at the time his testimony was obtained. Menetta Belcher, Sharp's employee on duty on April

27, 1981, could not say for sure that the sign was displayed on April 27, 1981, because it blew down at one time. She conceded that she had a poor memory and was unable to correlate convincingly her recollection that the sign had blown down with any specific date. Therefore, Kerr-McGee is liable for the violation of § 80.22(a) unless Kerr-McGee can demonstrate one of the affirmative defenses in § 80.23(b)(2).

### Affirmative Defenses

■ An essential element of any of the affirmative defenses provided in § 80.-23(b)(2) is that the violation was not caused by the refiner or its employees or agents. 40 C.F.R. § 80.23(b)(2)(i). Here Kerr-McGee has established that the unleaded gasoline delivered by it to Williams Pipe Line Company had a substantially lower lead content that .05 grams of lead per gallon. Similarly, Kerr-McGee has established that Williams Pipe Line Company would not accept unleaded gasoline from any other refiner with a lead content greater than .01 gram of lead per gallon. Also, Williams would not release any unleaded gasoline from its pipeline system to a wholesaler or distributor if the lead content exceeded .05 gram of lead per gallon. Therefore, even though Kerr-McGee's unleaded gasoline had been commingled by Williams with unleaded gasoline from other refiners when Loethen took possession of the gasoline in question from the Williams terminal in Kansas City, Kansas, it had a lead content under .05 gram of lead per gallon. The contamination occurred at an unknown time and for unknown reason after Loethen took delivery from Williams. Neither Kerr-McGee nor any of its agents or employees caused the violation.

■ Having satisfied § 80.23(b)(2)(i), Kerr-McGee then relies on two of the affirmative defenses provided in § 80.-23(b)(2). First, Kerr-McGee argues that it should escape liability because the violation was caused by an act in violation of law. Kerr-McGee asserts that when Sharp offered for sale non-Kerr-McGee gasoline under the Kerr-McGee brand or logo, Sharp violated both the Trade Mark Act of 1946, 15 U.S.C. § 1051, *et seq.* (commonly referred to as the Lanham Trade-Mark Act) and Missouri's Merchandising Practices Act, § 407.020 R.S.Mo. Kerr-McGee has failed to demonstrate how the Trademark Act of 1946 was violated by Sharp's selling non-Kerr-McGee gasoline under the Kerr-McGee brand or logo. Title 15 U.S.C. § 1114(1) provides that a violation occurs only "without the consent of the registrant. . . ." Kerr-McGee knew that its gasoline lost its identity when commingled by Williams Pipe Line and knew that Loethen bought gasoline at Williams from the refiner offering the best terms.

■ Furthermore, Kerr-McGee has not established that Missouri's Merchandising Practices Act, § 407.020 R.S.Mo., was violated by Sharp selling non-Kerr-McGee gasoline even though Sharp represented itself to be a Kerr-McGee station. However, even if there was a violation of § 407.020, Kerr-McGee knew the violation was occurring. Therefore, the violation of § 407.020 is not the type of law violation contemplated by the regulations that would release a refiner from liability for the violation of § 80.22(a).

■ Finally, Kerr-McGee has not established how the violation of § 80.22(a) "was caused" by the alleged violation of the Trademark Act of 1946 and Missouri's Merchandising Pratices Act as is required by § 80.23(b)(2)(ii). Specifically, Kerr-McGee has not demonstrated by reasonably specific showings that the violation was caused by some other person violating the law because misrepresenting the refiner of the gasoline being sold did not have anything to do with the violation of § 80.23(a). 40 C.F.R. § 80.23(b)(2)(viii).

For these reasons, Kerr-McGee has failed to establish the affirmative defense provided in § 80.23(b)(2)(ii).

■ Next Kerr-McGee asserts that it should escape liability because:

[T]he violation was caused by the action of a reseller or a retailer supplied by such reseller, in violation of a contractual

undertaking imposed by the refiner on such reseller designed to prevent such action, and despite reasonable efforts by the refiner (such as periodic sampling) to insure compliance with such contractual obligation.

40 C.F.R. § 80.23(b)(2)(iii).

The elements of this defense (in addition to establishing that the violation was not caused by the refiner) are: 1) the violation was caused by the action of a reseller or a retailer supplied by the reseller; 2) the violation was contrary to a contractual understanding imposed on the reseller designed to prevent the violation; and 3) the violation occurred despite reasonable efforts by the refiner to insure compliance with the contractual obligation.

■ For the reasons previously discussed, Kerr-McGee has demonstrated by "reasonably specific showings by direct or circumstantial evidence that the violation was caused or must have been caused by ..." either a reseller (Loethen) or a retailer supplied by a reseller (Sharp).

In addition, for a retail outlet supplied by Loethen to offer for sale unleaded gasoline with a lead content greater than .05 gram per gallon was contrary to the contractual obligation set forth in paragraph 15 of the Loethen/Kerr-McGee Refining Distribution Sales Agreement dated February 1, 1980. Furthermore, paragraph 15 was designed to prevent the sale of contaminated unleaded gasoline. For instance, Loethen agreed to not offer for sale as unleaded gasoline any contaminated gasoline.

■ Although the first two elements of the violation of contract affirmative defenses were thereby established, Kerr-McGee did not establish the third element of this affirmative defense because Kerr-McGee failed to take reasonable steps to insure compliance with paragraph 15. For instance, Kerr-McGee did nothing to insure that Loethen or the retail facilities to which Loethen delivered gasoline complied with paragraph 15. Periodic sampling of Loethen's delivery vehicles and of Kerr-McGee branded retail facilities was not done.

Kerr-McGee has not established that any other steps were taken to insure compliance with paragraph 15. Merely mailing literature about unleaded gasoline, without more, does not constitute "reasonable efforts ... to insure compliance with ..." paragraph 15.

Therefore, Kerr-McGee has failed to establish the breach of contract described in § 80.23(b)(2)(iii).

Kerr-McGee argues that the affirmative defenses provided in § 80.23 are not the only defenses available to a refiner to avoid liability under § 80.23(a)(1). Specifically, Kerr-McGee seeks to challenge § 80.-23(a)(1) because imposition of vicarious liability is not authorized by 42 U.S.C. § 7545(c). (Section 7545(c)(1) provides in part that the administrator of EPA may by regulation control the offering for sale or sale of any fuel if any emission product of the fuel may be reasonably anticipated to endanger public health or if emission products of such fuel will impair the performance of any emission control device.)

For the reasons stated in the Order filed August 20, 1985, this Court does not have jurisdiction to hear Kerr-McGee's challenge to the validity of § 80.23(a)(1).

■ In addition, Kerr-McGee argues that the plaintiff is attempting to impose liability on it as the result of an irrebuttable presumption of vicarious liability. Quite correctly, Kerr-McGee asserts that *Amoco Oil Company v. Environmental Protection Agency*, 501 F.2d 722 (D.C.Cir. 1974) ("*Amoco I*") rejected EPA's effort to create an irrebuttable presumption that a refiner was vicariously liable for a branded retailer's offense. *Id.* at 748–49, After *Amoco I*, § 80.23 was redrafted to add affirmative defenses permitting refiners the opportunity to demonstrate freedom from fault. Therefore, contrary to Kerr-McGee's assertion, the regulatory scheme applicable to this case does not impose an irrebuttable presumption of liability because seven affirmative defenses are available to the refiner. *See* § 80.23(b)(2)(i) through (vii).

*Remedy*

Section 7545(d), 42 U.S.C., provides in part as follows:

Any person who violates ... shall forfeit and pay to the United States a civil penalty of $10,000 for each and every day of the continuance of such violation, which shall accrue to the United States and be recovered in a civil suit in the name of the United States, brought in the district where such person has his principal office or in any district in which he does business. The Administrator may, upon application therefor, remit or mitigate any forfeiture provided for in this subsection and he shall have authority to determine the facts upon all such applications.

Here, the violation continued for sixteen days from April 21, 1981, through May 6, 1981. Therefore, Kerr-McGee must pay to the United States $160,000 as a civil penalty for its violation of § 80.22(a).

▪ Kerr-McGee argues that the EPA cannot impose a penalty before notice has been given to the alleged violator. The EPA inspectors notified Sharp on April 7, 1981, that their field test of one sample of unleaded gasoline showed excessive lead. Because notice was not received by Kerr-McGee from EPA until September 1, 1981, Kerr-McGee argues that no penalty can be assessed against it. Kerr-McGee cites no authority for the proposition that a penalty cannot be imposed on a refiner until notice is received. Furthermore, the basis for the vicarious liability imposed on refiners by § 80.23(a)(1) is the EPA's determination "that the contamination of unleaded gasoline associated with transportation of the product can best be prevented by the major refiners who have control or the ability to control their distribution networks." Administrator's Statement Preceding the Unleaded Gasoline Regulations, 38 Fed.Reg. 1254 (January 10, 1973), set forth in its entirety in an Appendix to *Amoco I,* 501 F.2d at 753.

Kerr-McGee's control over the distribution network should have resulted in the violation notice given to Sharp being passed up to distribution network to Kerr-McGee. Therefore, receipt of notice by the branded retailer should be adequate to result in notification of all levels in the distribution network above the retailer.

▪ Also, Kerr-McGee argues that this Court should exercise its equity jurisdiction to reduce the statutory penalty. To support the existence of equitable power to reduce a statutory penalty, Kerr-McGee relies on *Lloyd A. Fry Roofing Co. v. United States Environmental Protection Agency,* 415 F.Supp. 799 (W.D.Mo.1976). "Further, if an enforcement action were delayed for the purpose of accumulating large fines, plaintiff could invoke the equity jurisdiction of the court to prevent injustice." *Id.* at 806–07. Despite *Fry,* which involved different statutory and regulatory provisions from the instant case, Kerr-McGee has not persuaded this Court that it can ignore the plain wording of § 7545(d) that a violator shall pay "a civil penalty of $10,000 for each and every day of the continuance of such violation...." *See United States v. Dieckerhoff,* 202 U.S. 302, 313, 26 S.Ct. 604, 608, 50 L.Ed. 1041 (1906) ("It is not within the province of courts of equity to mitigate the harshness of penalties ... for such relief would run directly counter to the statutory requirements."); *Clark v. Barnard,* 108 U.S. 436, 457, 2 S.Ct. 878, 890, 27 L.Ed. 780 (1883) ("[W]here any penalty or forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred, for it would be in contravention of the direct expression of the legislative will.") Not only has Congress clearly provided for a daily penalty for each day the violation continued, but Congress has expressly authorized the Administrator, not this Court, to remit or mitigate any penalty.

▪ Finally, even if this Court could mitigate the fine to prevent an injustice, none has been established in this case. There is no evidence the EPA delayed taking any action for the purpose of accumu-

lating large fines. Furthermore, the EPA inspectors were justified in believing that notice of a violation to the branded retailer would be communicated up the distribution network.

### *Order*

For the foregoing reasons, it is hereby ORDERED that judgment is entered in favor of plaintiff and against defendants Kerr-McGee Corporation and Kerr-McGee Refining Corporation in the amount of $160,000, together with the costs of this action.