UNITED STATES of America, Plaintiff,

v.

PILOT PETROLEUM ASSOCIATES, INC.; Pilot Petroleum Products, Inc.; Sonic Petroleum Corp., Inc.; and O.B. Enterprises, Inc., Defendants.

No. 85 CV 2918.

United States District Court,
E.D. New York.

May 30, 1989.

Kiyo Matsumoto, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Marilyn Bennett, E.P.A., of counsel), for plaintiff.

Kenneth L. Robinson, Levine & Robinson, P.C., Mitchell Field, N.Y., for defendants Pilot Petroleum Associates, Inc. and Pilot Petroleum Products.

Paul Sibener, Tananbaum & Sibener, Commack, N.Y., for defendants Sonic Petroleum Corp., Inc. and O.B. Enterprises, Inc.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This action is before the Court on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, plaintiff's motion is granted and defendants' motion is denied.

## FACTS

### I. BACKGROUND

The United States of America brings this action against defendants for violations of § 211 of the Clean Air Act, 42 U.S.C. § 7545, and the Unleaded Fuels Regulations promulgated thereunder, 40 C.F.R. Part 80. The Complaint alleges that gasoline sold as unleaded at four gasoline retail outlets [1] and at one wholesale purchaser-consumer facility [2], contained more than the maximum allowable lead content of 0.05 grams of lead per gallon in violation of 40 C.F.R. § 80.22(a). The United States seeks a judgment of $10,000 from defendants for each day that this gasoline was sold through the outlets or the facility to the motoring public. Judgment is sought against defendants Pilot Petroleum Associates, Inc. and Pilot Petroleum Products, Inc. ("Pilot"),[3] on the theory that Pilot is

---

1. A retailer is "any person who owns, leases, operates, controls, or supervises a retail outlet." 40 C.F.R. § 80.2(k). A retail outlet is "any establishment at which gasoline is sold or offered for sale for use in motor vehicles." *Id.* § 80.2(j).

2. A wholesale purchaser-consumer is "any organization that is an ultimate consumer of gasoline and which purchases or obtains gasoline from a supplier for use in motor vehicles and receives delivery of that product into a storage tank of at least 550-gallon capacity substantially under the control of that organization." 40 C.F. R. § 80.2(o).

3. Defendants initially seek to create an issue of fact whether Pilot Petroleum Associates, Inc. ("PPA") and Pilot Petroleum Products, Inc. ("PPP") should be considered as one defendant. Their sole ground in support of this argument is that PPA and PPP are separate legal entities. Both corporations, however, were owned by Joseph Aracri (50%) and John Papandon (50%),

had the same officers, directors, employees, telephone number and business address, and engaged in the same business activity. *See* Aracri Affidavit ¶ 5–7 at 3. PPA commenced business operation in 1977 and PPP began doing business "in 1984." *Id.* ¶ 8 at 3. PPA was sold in 1985. *Id.* PPP and PPA represented themselves to the public interchangeably as PPP, PPA, Pilot Petroleum or Pilot, and thus without regard to corporate distinction. *See* Plaintiff's Exhibits 5–8, 17–19 and 21. That two separate corporations were operating as one, however, is immaterial since both corporations can be held jointly and severally liable.

This same argument is advanced by Sonic/O.B. No evidence has been produced by Sonic/O.B. that would support its theory that the corporate distinction between Sonic Petroleum Corporation, Inc. ("Sonic") and O.B. Enterprises, Inc. ("O.B.") creates a material issue of fact. The Court nevertheless finds that the respective corporations had the same owners, officers and directors and represented themselves

liable as the distributor of the gasoline, 40 C.F.R. § 80.21(a), and from Sonic Petroleum Corporation, Inc. and O.B. Enterprises, Inc. ("Sonic/O.B."), on the theory that Sonic/O.B. and Pilot are jointly and severally liable as the distributors that sold or transferred the gasoline to two of the four retail outlets. 40 C.F.R. § 80.23(a)(2). Pilot and Sonic/O.B. are both "persons" within the meaning of 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e) in that they are engaged in the business of reselling and distributing gasoline, and distributors of gasoline as defined by 40 C.F.R. § 80.2(*l* ).

The parties have completed all discovery. After the cross-motions for summary judgment were filed, and the action was reassigned to this Court, the Court ordered defendants to file a statement pursuant to Local Rule 3(g), and permitted plaintiff to reply thereto. *See United States v. Pilot Petroleum Associates*, 122 F.R.D. 422 (E.D.N.Y.1988).

The following facts are set forth below as they relate to the situs of each alleged violation. The Court notes at the outset, that the evidence produced by defendants purporting to contradict plaintiff's statement of undisputed material facts is either irrelevant, incompetent or fails to refute a material fact in issue. Accordingly, virtually all the facts as set forth below are undisputed.

## II. PILOT # 74

Dominic Mastropolo and/or the entity known as Santero Petroleum is a gasoline retailer as defined by 40 C.F.R. § 80.2(k), operating a gasoline retail outlet, *id.* at § 80.2(j), located at 61–20 Fresh Meadow Lane, Fresh Meadow, New York. Plaintiff seeks civil penalties for the sale at this outlet of unleaded gasoline containing in excess of 0.05 grams of lead per gallon for one day, March 1, 1984.

This retail outlet was designated by Pilot as Pilot # 74. The only brand name that appeared at the retail outlet was that of Pilot. The corporate, trade or brand name of a gasoline refiner was not displayed. The retail outlet and Pilot agreed that the retail outlet would buy its supply of gasoline exclusively from Pilot. *See* Deposition of Joseph Araci, February 6, 1987 at 155. Pilot also has an ownership or leasehold interest in the pumps and the sign at the retail outlet.

The United States Environmental Protection Agency ("EPA") inspected the Pilot # 74 retail outlet on March 1, 1974. A sample of gasoline was taken from the unleaded pump and tested. Analysis disclosed that the sample contained in excess of 0.05 grams of lead per gallon. For the months prior to the day of the inspection, Pilot was the supplier of the retail outlet's unleaded gasoline. Each delivery was made via a gasoline transporter on Pilot's orders. Indeed, approximately four hours before the inspection, Pilot # 74 received from Pilot a delivery of 1500 gallons of gasoline represented to be unleaded, and 1500 gallons of leaded gasoline. Pilot # 74 paid for the gasoline it received by making deposits in Pilot's bank account. Pilot # 74 received another delivery of gasoline from Pilot the following day, March 2, 1984.

## III. BABYLON BANANA

Babylon Banana, Inc., located at 62 East Main Street, Babylon, New York, is a wholesale purchaser-consumer of gasoline, 40 C.F.R. § 80.2(*o*). See *supra*, note 2.

Babylon Banana was also inspected on March 1, 1984 by EPA officials. A sample of gasoline represented to be super unleaded was taken from the Babylon Banana pump and tested. Analysis disclosed that

interchangeably as Sonic or O.B. *See* Plaintiff's Exhibits 16, 20 and 21. The reasoning set forth above with respect to Pilot, thus, applies with equal force to Sonic/O.B.

In light of the way the defense in this action has been conducted, the Court finds this argument disturbing. The unsupported allegation of material fact issues with regard to the corporate distinction of Pilot and Sonic/O.B. necessarily

raises a potential conflict of interest between PPA and PPP and between Sonic and O.B. Nevertheless, PPA and PPP are represented by the same counsel, Kenneth L. Robinson, and Sonic and O.B. are jointly represented by Paul Sibener. Even more disconcerting is the fact that all defendants appear jointly in this motion notwithstanding that arguments are made seeking to shift liability from Pilot to Sonic/O.B.

it contained in excess of 0.05 grams of lead per gallon.[4]

For at least one year prior to the day of the inspection, Babylon Banana purchased all of its gasoline from Pilot. *See* Declaration of Albert Kister, June 26, 1987 at ¶ 2. Pilot hired a transporter to deliver each order of gasoline to the Babylon Banana facility. Pilot represented that the gasoline was unleaded. The gasoline was delivered to Babylon Banana via a gasoline transporter on Pilot's orders. Pilot was paid for its deliveries by check from Babylon Banana.

The last delivery of gasoline that Babylon Banana received from Pilot prior to the March 1st inspection was 3,601 gallons of gasoline represented to be super unleaded on January 5, 1984. Babylon Banana did not receive its next delivery until March 15, 1984. On March 15th the gasoline remaining in the Babylon Banana storage tank was pumped out by Pilot. Each day from January 5, 1984 to March 15, 1984, except Wednesdays and Sundays, five Babylon Banana trucks and an automobile owned by Albert Kister, President of Babylon Banana, obtained gasoline from the Babylon Banana storage tank.

Plaintiff seeks civil penalties for each day during the period January 5, 1984 to March 15, 1984, except Wednesdays and Sundays, for a total of 51 days.

## IV. PILOT # 29

Tony Lynn Associates is a gasoline retailer, 40 C.F.R. § 80.2(k), operating a gasoline retail outlet, *id.* at 80.2(j), located at 100 Crooked Hill Road, Commack, New York. This outlet was designated by Pilot as Pilot # 29. A "Firehouse 5" sign, owned by Pilot, was displayed at the outlet at Pilot's behest. No corporate, trade or brand name of a gasoline refiner was displayed.

Pilot owned the marketing equipment at the outlet, which included the five gasoline pumps, the lights and the self-service

equipment. Defendants disagree with plaintiff's assertion that Pilot owned the entire retail outlet and leased it to Tony Lynn Associates. From December 1982 through July 1985, Pilot and Tony Lynn Associates had a gasoline supply agreement that required Tony Lynn Associates to purchase all of its gasoline requirements from Pilot. Pilot claims that pursuant to an agreement between it and Sonic/O.B., Sonic/O.B. sold and delivered the gasoline ordered through Pilot by Tony Lynn Associates.

On March 1, 1984, EPA officials inspected the Pilot # 29 retail outlet and took a sample of gasoline represented to be unleaded. Analysis disclosed that the gasoline contained in excess of 0.05 grams of lead per gallon.

Pilot also claims that Tony Lynn Associates often received gasoline deliveries from other distributors during the relevant time period, notwithstanding the supply agreement with Pilot. No competent evidence has been adduced to support this claim. Nor is there any competent evidence refuting plaintiff's claim that the last delivery of gasoline prior to the March 1, 1984 EPA inspection was made on February 28, 1984, and that the delivery was made by Pilot. Plaintiff seeks civil penalties for the period February 28, 1984 to March 1, 1984.

## V. PILOT # 18

Martan Petroleum Ltd. is a gasoline retailer as defined by 40 C.F.R. § 80.2(k), operating a gasoline retail outlet, *id.* § 80.2(j), located at 956 Little East Neck Road, West Babylon, New York. The Martan retail outlet was designated by Pilot as Pilot # 18. Although a Pilot sign was displayed at the outlet, the corporate, trade or brand name of a gasoline refiner was not displayed.

Pilot owns the gasoline pump, the underground gasoline storage tanks and the Pilot sign at the outlet, and leased or subleased the outlet to Tay Management Cor-

---

4. Although two samples were taken from the Babylon Banana facility, only one was sent to the laboratory for testing. *See* Declaration of William E. Stager, August 13, 1987 at 4–5; Sup-

plemental Declaration of William E. Stager, January 21, 1988. Thus, defendants' assertion that one of the samples was lost between sampling and the testing facility is belied by the evidence.

poration, who in turn, leased it to Martan. Pilot and Tay had a gasoline supply agreement that required Tay to purchase its gasoline requirements from Pilot. In accordance with the Pilot–Tay supply agreement, Tay and Martan agreed that Pilot # 18 would obtain its gasoline supply from Pilot.

In January and February 1984, pursuant to a written agreement between Pilot and Sonic/O.B., Pilot transferred to Sonic/O.B. at least twelve orders for gasoline that it received from Pilot # 18. On each occasion that the Pilot # 18 orders were transferred to Sonic/O.B., Sonic/O.B. arranged to have the gasoline delivered and received payment therefor from Pilot # 18. Pilot then received a rebate from Sonic/O.B. of two and one-half cents for each gallon of gasoline delivered by Sonic/O.B. to Pilot # 18. In February 1984, Pilot also sold gasoline directly to Pilot # 18 without transferring the order to Sonic/O.B. The last delivery of gasoline to Pilot # 18 prior to the March 1, 1984 EPA inspection was made on February 27, 1984. Pilot # 18 had ordered the gasoline from Pilot, who then transferred the order to Sonic/O.B.

The gasoline delivered on February 27, 1984 was dispensed or offered for sale until March 2, 1984. Plaintiff seeks civil penalties for this five day period.

## VI. PILOT # 19

Thomas Cook is a gasoline retailer as defined by 40 C.F.R. § 80.2(k), operating a gasoline retail outlet, *id.* at § 80.2(j), under the name Premier Automotive Repair, located at 781 Montauk Highway, Bayport, New York. The outlet was designated by Pilot as Pilot # 19. The only brand name displayed at the outlet was that of Pilot— the corporate, trade or brand name of a gasoline refiner was not displayed. Pilot owned a gasoline pump and the Pilot sign at the outlet. Pilot had a gasoline supply agreement with Pilot # 19 that required Pilot # 19 to purchase its gasoline requirements from Pilot.

On July 30, 1984, EPA officials inspected the Pilot # 19 retail outlet and took a sample of gasoline represented to be premium unleaded from the pump. Analysis of the sample disclosed that it contained in excess of 0.05 grams of lead per gallon. Defendants' independent analysis of the sample confirmed EPA's test results.

Pilot # 19 received its last delivery of gasoline before the July 30, 1984 inspection on July 27, 1984. On July 27, 1984, Pilot sold 2000 gallons of gasoline represented to be leaded, 800 gallons of gasoline represented to be unleaded and 800 gallons of gasoline represented to be super or premium unleaded to Pilot # 19. For several months preceding the July 30, 1984 EPA inspection, Pilot transferred gasoline orders it received from Pilot # 19 to Sonic/O.B. Based on gasoline orders by Pilot # 19 that were transferred by Pilot to Sonic/O.B., from May 1984 through August 31, 1984, Sonic/O.B. sold approximately 17,400 gallons of gasoline to Pilot # 19 each month. Sonic/O.B. arranged for a trucking company to deliver that gasoline. On each occasion that Pilot transferred orders from Pilot # 19 to Sonic/O.B., Sonic/O.B. would pay Pilot a two and one-half cent rebate for each gallon sold. Plaintiff, however, seeks civil penalties for only one day, July 30, 1984.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

A party opposing a motion for summary judgment simply cannot make a secret of

his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to "smoke out" the facts so that the judge can decide if anything remains to be tried.

*Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

Four of the five gasoline samples collected and analyzed by the EPA were destroyed by the EPA in accordance with standard laboratory procedures sometime shortly after this lawsuit commenced. There is no bad faith alleged against the EPA. Rather, the parties appear to agree that the destruction of the evidence was due to EPA negligence in failing to order preservation of the samples. Nevertheless, defendants argue that they have been unduly prejudiced and that the unavailability of the gasoline samples creates an issue of fact whether the gasoline samples contained excess lead.

Defendants raised this issue before Judge Bramwell on its motion to dismiss pursuant to Fed.R.Civ.P. 37 based on plaintiff's failure to preserve the gasoline samples. Ruling from the bench on October 3, 1986, Judge Bramwell denied defendants' motion noting that the evidence was not destroyed in bad faith and that because defendants would have the opportunity to inspect EPA documents and examine EPA officials on the chain of custody, collecting, transferring, testing and shipping of the gasoline samples, the prejudice suffered by defendants, although unfortunate, was not great.

Although discovery is complete and the cross-motions for summary judgment are filed, defendants raise no issue about the integrity of the samples or the accuracy of the testing conducted at the EPA laboratory. No evidence has been adduced by defendants to suggest that, for one reason or another, the EPA test results are unreliable. Ordinarily, the unavailability of the samples would put the chemists' credibility in issue and defeat summary judgment. However, defendants have not made an adequate showing that the chemists' credibility can be impeached. For example, defendants do not challenge the method of testing or the chain of custody.[5] Indeed, it appears that defendants have failed to take the deposition of any of the chemists. Thus, the affidavits of the chemists demonstrating the meticulous testing procedures and chain of custody have not been impeached. Were this case to go to trial, the samples would still be unavailable and only the validity of the testing procedures would be in issue.

In the absence of any material fact surrounding the credibility of the chemists, and hence, the validity of the testing procedures, summary judgment is appropriate. *See Sterling National Bank & Trust Co. v. Federated Department Stores, Inc.,* 612 F.Supp. 144, 146 (S.D.N.Y.1985); *Carroll v. United Steelworkers,* 498 F.Supp. 976, 978 (D. Md.), *aff'd without opinion,* 639 F.2d 778 (4th Cir.1980); *compare Transway Finance Co. v. Gershon,* 92 F.R.D. 777, 778 (E.D.N.Y.1982) (evidence of scheme to defraud sufficient to put credibility in issue in an action to recover on an insurance policy). The Court notes, parenthetically, that defendants' own examination of the one sample EPA did preserve, confirmed the EPA test results. "Hope alone will not raise a triable issue." *Bachrach v. Farbenfabriken Bayer AG,* 36 N.Y.2d 696, 366 N.Y.S.2d 412, 325 N.E.2d 872 (1975) (issue of credibility insufficient to raise a jury question).

## II. STATUTORY AND REGULATORY FRAMEWORK

Pursuant to § 211(c) of the Clean Air Act, 42 U.S.C. § 7545(c)(1), the Administrator of the EPA is authorized to regulate fuels or fuel additives, which, in his judgment, may endanger public health or impair the performance of any motor vehicle emission control devise. To implement

---

5. The only question raised regarding chain of custody is not supported by the record. See *supra,* note 4.

§ 211(c), the EPA has promulgated the Unleaded Fuels Regulations, 40 C.F.R. Part 80, based on a determination that (1) the introduction of leaded gasoline into certain motor vehicles renders inoperative certain emission control devises and (2) airborne lead from auto emissions presents a public health hazard.

■ A distributor is defined by EPA regulations as "any person who transports or stores or causes the transportation or storage of gasoline at any point between any gasoline refinery and any retail outlet or wholesale-purchaser-consumer's facilities." 40 C.F.R. § 80.2(*l*). Defendants argue that they are not distributors within the meaning of this section because they "merely arranged for the picking up of gasoline at the terminals, the transportation of the gasoline to retailers and their customers, and the unloading of the gasoline at the delivery points, in accordance with the instructions of the retailers." Defendants' Memorandum of Law at 9. The plain language of § 80.2(*l*), however, provides that *"causing the transportation or storage of gasoline,"* will suffice to bring a person within the definition of distributor. The Court must conclude, therefore, that defendants, having, at the very least caused the transportation of the gasoline, are distributors.

Plaintiff seeks to hold Pilot liable as the distributor that sold or transferred the gasoline to each of the four retailers and Babylon Banana, the one wholesale purchaser-consumer of gasoline, for violations of 80 C.F.R. §§ 80.21(a) and 80.22(a). Section 80.21(a) provides:

After July 1, 1974 no distributor shall sell or transfer to any distributor, retailer or wholesale purchaser-consumer any gasoline which he represents is unleaded unless such gasoline does, in fact, met [sic] the defined requirements for unleaded gasoline in § 80.2(g).

Unleaded gasoline is gasoline containing no more than 0.05 grams of lead per gallon. 40 C.F.R. § 80.2(g).

Section 80.22(a) provides:

After July 1, 1974 no retailer or his employee or agent and after January 31, 1975 no wholesale purchaser-consumer or his employee or agent shall sell, dispense, or offer for sale gasoline represented to be unleaded unless such gasoline meets the defined requirements for unleaded gasoline in § 80.2(g); nor shall he introduce, or cause or allow the introduction of leaded gasoline into any motor vehicle which is labeled "unleaded gasoline only," or which is equipped with a gasoline tank filler inlet which is designed for the introduction of unleaded gasoline.

The liability of a distributor for violations of §§ 80.21(a) and 80.22(a) is set forth at 40 C.F.R. § 80.23(a)(2). Section 80.23(a)(2) provides:

Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries does not appear on the pump stand and is not displayed at the retail outlet or wholesale purchaser-consumer facility from which the gasoline was sold, dispensed, or offered for sale, the retailer or wholesale purchaser-consumer and any distributor who sold that person gasoline contained in the storage tank which supplied that pump at the time of the violation shall be deemed in violation.

Under § 80.23(d), however, "the distributor will not be deemed in violation [of § 80.23(a)(2)] if he can demonstrate that the violation was not caused by him or his employee or agent." 40 C.F.R. § 80.23(d). Using the same regulatory basis, plaintiff also seeks to hold Pilot and Sonic/O.B. jointly and severally liable as the distributors that sold the gasoline to Pilot # 18 and Pilot # 19.

## III. DEFENDANTS' LIABILITY

■ All of the gasoline dispensed or offered for sale as unleaded at Pilot # 74, Babylon Banana and Pilot # 29 was sold by defendant Pilot. The purchase invoices produced demonstrate that in accordance with the supply agreement that Pilot had with Pilot # 74, Pilot # 74 purchased what was represented to be unleaded gasoline from Pilot almost every day, and some-

times twice a day for several months prior to the March 1, 1984 EPA inspection. Indeed, hours before the March 1, 1984 inspection, Pilot sold and delivered "unleaded" gasoline to Pilot # 74. Pilot also arranged for the transportation of the gasoline it sold. Based on this evidence, the Court concludes that the gasoline contained in the storage tank at Pilot # 74 at the time of the EPA inspection was sold by Pilot.

■ For more than one year prior to the March 1, 1984 EPA inspection, Pilot was also the sole seller of gasoline to Babylon Banana, which purchased only super unleaded gasoline from Pilot during that time period. Kister Declaration at ¶ 12. Pilot also arranged for the transportation of the gasoline by one George Rice to Babylon Banana. Purchase invoices obtained from the owner of Babylon Banana, Inc. and produced by defendant Pilot establish that Pilot was the seller of the gasoline and corroborate the Kister declaration. *See* Plaintiff's Exhibits 6, 7, and 8. Finally, on each occasion that Babylon Banana's records show that it purchased gasoline, Pilot admitted the sale. *See* Plaintiff's Exhibit 3 (Nos. 14, 16, 18, 20, 22 and 24). Based on the foregoing, the Court concludes that the gasoline contained in the Babylon Banana's storage tank at the time of the violation was supplied by Pilot.[6]

The president of the corporation that leased and operated the Pilot # 29 retail outlet, Roy Vandenberg, stated that for several years prior to the March 1, 1984 EPA inspection, all of the gasoline for the Pilot # 29 retail outlet was purchased from Pilot. Vandenberg Declaration at ¶ 13; Spinella Declaration at ¶ 15. The Vandenberg declaration is corroborated by a gasoline supply agreement that Pilot had with this retailer, in which Pilot required that the retailer purchase all of its gasoline from Pilot. *See* Plaintiff's Exhibit 1.

That Pilot and Sonic/O.B. jointly sold gasoline to the Pilot # 18 retail outlet, and were the sole sellers of gasoline to Pilot # 18 prior to the EPA inspection is evinced by the declaration of Alessandro Pirozzi, president of the retailer who subleased and operated Pilot # 18 retail outlet. In his declaration, Pirozzi states that for more than one year prior to the date of the March 1, 1984 EPA inspection, he purchased all of the gasoline for the retail outlet from Pilot in accordance with a gasoline supply agreement between Pilot and Tay Management Corporation, the company to whom Pilot leased the premises. At the time that Pilot received the gasoline orders from the Pilot # 18 retail outlet, Pilot would also instruct the retailer as to the manner of payment and to whom payment should be made. *See* Pirozzi Declaration at ¶ 15.

Pilot received payment for each order of gasoline that it received from Pilot # 18 and transferred to Sonic/O.B. through a rebate from Sonic/O.B. based on the number of gallons actually sold to Pilot # 18. *See* Plaintiff's Exhibits 3 (No. 92) and 14 (No. 2(b)). In February 1984, in addition to receiving gasoline orders from Pilot # 18 and transferring the orders to Sonic/O.B., Pilot also sold gasoline directly to Pilot # 18. *See* Plaintiff's Exhibits 1, 3 (No. 111) and 17.

The evidence also establishes that Sonic/O.B. sold gasoline to the Pilot # 18 retail outlet prior to the March 1, 1984 inspection. Sonic/O.B. received gasoline orders by Pilot # 18 from Pilot, arranged for the transportation of the gasoline to the Pilot # 18 retail outlet, and received payment for the gasoline from the Pilot # 18 retail outlet. *See* Plaintiff's Exhibits 3 (No. 89), 12, 14 (No. 1(a)), and 16.

6. Defendants seek to create an issue of fact by arguing that the sale of gasoline to Babylon Banana, Pilot # 18, Pilot # 19 and Pilot # 29 was made by George Rice. The unrebutted testimony of George Rice establishes, however, that it was Pilot who sold and arranged for the delivery of "unleaded" gasoline to Rice's storage tank, that Rice stored the gasoline for Pilot, and that Rice would transport the gasoline on Pilot's orders to Pilot's customers, including Babylon Banana, Pilot # 18, Pilot # 19 and Pilot # 29. That Rice may also be liable for EPA violations is irrelevant. Under these circumstances, Rice's participation does not absolve Pilot of liability. *See United States v. Nobek Distributors,* No. 85 CV 2919 slip op. at 4 (E.D.N.Y. April 22, 1986) (ERK).

Based on the foregoing, the Court must conclude that Pilot and Sonic/O.B. jointly sold to Pilot # 18 all of the gasoline contained in its underground storage tank at the time of the EPA inspection.

The evidence also establishes that Pilot and Sonic/O.B. jointly sold to Pilot # 19 the gasoline contained in its unleaded gasoline storage tank at the time of the July 30, 1984 EPA inspection. Pilot had a gasoline supply agreement with Pilot # 19 that required Pilot # 19 to purchase all of its gasoline from Pilot. The gasoline purchase records of Pilot # 19 demonstrate that Pilot and Sonic/O.B. sold to Pilot # 19 all of the gasoline prior to the July 30, 1984 EPA inspection. *See* Plaintiff's Exhibits 14 (No. 1), 19, 21 and 24. Pilot received each of the gasoline orders by Pilot # 19, instructed Pilot # 19 how and to whom payment for the gasoline should be made, transferred the orders to Sonic/O.B., and was paid for the gasoline through the receipt of a rebate from Sonic/O.B. for each gallon of gasoline actually sold to Pilot # 19. *See* Plaintiff's Exhibits 3 (Nos. 60, 70, 72), and 14 (No. 2(b)).

Throughout the time period that Pilot agreed to transfer gasoline orders by Pilot # 19 to Sonic/O.B., Pilot reserved the right to sell gasoline directly to Pilot # 19. *See* Plaintiff's Exhibit 1, at ¶ 3. Pursuant to that agreement, the last delivery of gasoline received by Pilot # 19 prior to the EPA inspection on July 30, 1984, was sold to Pilot # 19 directly by Pilot on July 27, 1984. *See* Plaintiff's Exhibits 3 (No. 62 and 63) and 40.

From this evidence, the Court concludes that Pilot and Sonic/O.B. jointly sold to Pilot # 19 all the gasoline contained in its underground storage tank at the time of the EPA inspection.

In sum, given EPA's test results showing that the gasoline offered for sale as unleaded at the retail outlets and wholesale purchaser-consumer facility contained more than 0.05 gram of lead per gallon, together with evidence establishing that Pilot and Sonic/O.B. sold the gasoline to the five locations, the Court concludes that violations of 40 C.F.R. § 80.22(a) occurred and that the defendants, as the distributors, are liable for the violations under 40 C.F.R. § 80.23(a)(2).

Defendants make two arguments against the imposition of liability under the EPA regulations. First, defendants challenge plaintiff's interpretation that there exists a presumption of liability in the Unleaded Fuels Regulations, 40 C.F.R. § 80.23(a)(2), and maintain that they have made the necessary showing to satisfy the defense provided in § 80.23(d). Second, defendants argue that the manner in which EPA collected the gasoline samples precludes summary judgment in plaintiff's favor.

### A. *Presumption of Liability under the Unleaded Fuels Regulations*

As set forth above, where the corporate, trade, or brand name of a gasoline refiner is not displayed at a retail outlet or wholesale purchaser-consumer facility and the outlet or facility is dispensing unleaded gasoline that does not meet EPA standards, the distributor who supplied the gasoline is deemed in violation unless the distributor can demonstrate that the violation was not caused by him, his employee or agent. 40 C.F.R. § 80.23(a)(2), (d).

Relying on *Amoco Oil Co. v. Environmental Protection Agency*, 501 F.2d 722 (D.C.Cir.1974), and *Amoco Oil Co. v. Environmental Protection Agency*, 543 F.2d 270 (D.C.Cir.1976), defendants' principal argument is that plaintiff has improperly shifted the burden of proof to defendants. Defendants' reliance on the *Amoco* cases is misplaced. Following the challenges to the EPA regulations made therein, the EPA amended its regulations to provide for a rebuttable presumption of liability. Defendants, however, do not challenge the current EPA regulations as they apply to gasoline distributors pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. Accordingly, the Court must construe the regulations as written.

Defendants also argue, presumably in the alternative, that they have successfully rebutted the presumption pursuant to § 80.23(d). Their defense rests primarily with evidence of their "hands-off" method

of operating, which does not seek to control product quality. There is no evidence, however, that defendants, their employers or their agents did not cause the violations.

Pilot's principal testified that lead testing by Pilot was conducted once every other month only during 1982 and 1983, that no tests were conducted at the five locations at issue and that no records of test results were maintained. *See* Deposition of Joseph Alacri February 6, 1987 at 42–43, 136. Defendants have failed to established that the gasoline that they "never saw" but nevertheless represented to be and sold as unleaded, was indeed, unleaded gasoline. In a desperate attempt to create an issue of fact, defendants have manufactured myriad hypothetical possibilities that would place blame for the contaminated gasoline on various other persons who are either further up the distribution chain (*i.e.:* the refiner) or further down the distribution chain (*i.e.:* the retailer). This kind of speculation is insufficient to establish a § 80.23(d) defense or defeat summary judgment. Moreover, even if the contamination occurred at the refinery level, or any other place in the chain of distribution before it was received by defendants, the law prohibits defendants from distributing that gasoline as unleaded. Finally, it is undisputed that the gasoline transporters were hired by defendants to effect delivery. There is no evidence that the transporters, defendants' agents, did not cause the violation. C.F.R. § 80.23(d). In sum, defendants' theory that their status as "middlemen" insulates them from liability is rejected.

B. *The Manner in which the Gasoline Samples were Collected*

██ Defendants complain that plaintiff has failed to demonstrate that the gasoline sold at the four retail outlets and the wholesale purchaser-consumer facility contained in excess of 0.05 grams of lead because the EPA inspectors collected the samples from the pumps designated as dispensing unleaded gasoline, rather than from the underground storage tank that fed those pumps. This argument is wholly without merit.

A violation is defined as selling, dispensing or offering for sale gasoline represented to be unleaded that is not unleaded as defined by § 80.2(g). 40 C.F.R. § 80.22(a). A distributor who sells gasoline contained in the storage tank that supplies the pump has committed a violation. *Id.* § 80.23(a)(2). Because the contaminated gasoline was sold, dispensed, or offered for sale from the pump and not directly from the storage tank, the collection of gasoline samples from the pump is entirely proper. The relevant regulations require nothing to the contrary.

Accordingly, the Court concludes that defendants are liable for the EPA violations set forth above.

IV. CIVIL PENALTY

██ Section 211(d) of the Clean Air Act provides that any person who violates the Act or the regulations promulgated thereunder "*shall* forfeit and pay to the United States a civil penalty of *$10,000 for each and every day of the continuance of such violation*." 42 U.S.C. 7545(d) (emphasis added). The language of the statute is mandatory and does not vest the Court with discretion to remit or mitigate the penalty. *See United States v. Sharp*, 645 F.Supp. 337, 344–45 (W.D.Mo.1986); *United States v. Robinson*, No. 3–84–1606–H, slip op. at 3 (N.D.Tex. July 25, 1985); *United States v. Gruner*, No. 3–84–1607–R, slip op. at 7 (N.D.Tx. Sept. 5, 1985); *compare* 42 U.S.C. § 7524 (new car dealers who remove emission control devises "shall be subject to a civil penalty of *not more than* $10,000." (emphasis added)).

Thus, the civil penalty of $10,000 must be multiplied by the total number of days that the gasoline sampled by the EPA and found to be in violation of the regulations was sold, dispensed or offered for sale at each of the four retail outlets and the one wholesale purchase-consumer facility.

The evidence discloses that the correct number of days is 61: one day (March 1, 1984) at Pilot # 74; 51 days (January 5— March 15, 1984 (except Wednesdays and Sundays)) at Babylon Banana; three days

(February 28—March 1, 1984) at Pilot # 29; five days (February 27—March 2, 1984) at Pilot # 18; and one day (July 30, 1984) at Pilot # 19. The total amount of the penalty assessed must be, and hereby is, $610,000.

## CONCLUSION

Plaintiff's motion for summary judgment is hereby granted and the penalty assessed shall be $610,000. Defendants' cross-motion for summary judgment is hereby denied.

SO ORDERED.