Alex KALIKA, Plaintiff,

v.

A. David STERN, Defendant.

No. 92 CV 3763 (SJ).

United States District Court,
E.D. New York.

Dec. 6, 1995.

596

MEMORANDUM AND ORDER

JOHNSON, District Judge:

Before this Court is Defendant's motion for summary judgment, pursuant to Fed. R.Civ.P. 56(b), as to all five causes of action in the above-referenced lawsuit.[1] For the reasons detailed herein, Defendant's motion for summary judgment is GRANTED. Defendant's motion for sanctions pursuant to Fed.R.Civ.P. 11 is DENIED.

## BACKGROUND

This lawsuit arises from the Kings County, New York, prosecution of the Plaintiff, Alex Kalika, for an alleged violation of N.Y.Dom. Rel.Law § 253 ("DRL § 253"). The gravamen of Plaintiff's complaint is that the Defendant, A. David Stern, improperly informed the Kings County District Attorney's Office that 1) Plaintiff had been married in a valid Jewish ceremony; 2) Plaintiff and his ex-wife needed a religious divorce called a "Get;"[2] and, 3) Plaintiff had falsely stated that he had "removed all barriers to [her] remarriage" in his civil divorce proceeding, violating DRL § 253(8).[3] In support of his claims, Kalika alleges that Stern knew or should have known that: 1) Kalika's ex-wife was not Jewish; 2) their wedding was not valid under Jewish law; and 3) therefore, Kalika's statement that he had "removed all barriers to remarriage" pursuant to DRL § 253 was accurate.

D'Addario & Kurtz by Richard J. Kurtz, New York City, for Plaintiff.

Morris, Duffy, Alonso & Marulli by Barry M. Viuker, New York City, for Defendant.

1. Plaintiff's failure to file a memorandum of law in opposition to Defendant's motion, as required under Local Civil Rule 3(b) for the Eastern District of New York, will not be considered a default. The Court will consider Defendant's motion on the merits.

2. Conservative and Orthodox sects of the Jewish religion do not "recognize the power of a civil divorce to dissolve a marriage ... [otherwise] recognize[d] as religiously valid and binding." Affirmation of A. David Stern Dated January 26, 1994 ("Stern Aff.") ¶ 8. In order to obtain a Jewish religious divorce, both spouses must participate in a technical procedure popularly called a "Get." Id. at ¶ 9. Without the Get, spouses are precluded by Jewish law from remarrying and even from dating. Id. The power of one spouse to withhold a Get has been used to demand inequitable financial concessions from a spouse, or simply to inflict anguish on a spouse. Id. at ¶ 10.

In addition, a Get is apparently more readily obtainable by the husband than by the wife. Alan D. Scheinkman, § 253 Practice Commentary, in N.Y.Dom.Rel.Law (McKinney 1986), at 852. DRL § 253 was enacted "to provide a remedy for the 'tragically unfair' situation presented where a Jewish husband refuses to [provide a Get]." Id. at 851.

3. DRL § 253(8) states:

Any person who knowingly submits a false sworn statement under this section shall be guilty of making an apparently sworn false statement in the first degree and shall be punished in accordance with section 210.40 of the penal law.

N.Y.Dom.Rel.Law § 253(8) (McKinney 1986).

Alex Kalika married Julie Zlatin sometime in September, 1986.[4] In March 1987, Kalika and Ms. Zlatin separated. Kalika initiated divorce proceedings in the Spring of 1988.[5] Ms. Zlatin did not contest the divorce action, and the marriage was dissolved by a default judgment in July 1988. Pursuant to DRL § 253, Kalika filed a sworn statement dated May 14, 1988 indicating that he had taken all steps within his power "to remove all barriers to [Zlatin's] remarriage following the . . . divorce." Ex. 5 to Stern Aff. Kalika subsequently remarried in an Orthodox Jewish ceremony.

In 1990, Ms. Zlatin became acquainted with Stern, an attorney, while she was working as a legal secretary at the law firm from which he rented office space. Ms. Zlatin approached Stern to ask whether, under Jewish law, she was properly divorced from Kalika. Stern Aff. ¶ 15. Ms. Zlatin told Stern that she did not know whether she needed a Get in addition to the civil divorce that had been entered 18 months earlier. She provided him with the details of her marriage and divorce. Stern then reviewed the pleadings, judgment, and other papers from the divorce proceeding, and determined that a number of property issues had not been settled. Stern Aff. ¶ 16.

At this point, Ms. Zlatin informed Stern that she could not afford legal fees. Stern agreed to help her obtain a Get "free of charge." Stern Aff. ¶ 18. He declined to represent her in connection with any financial claims against Kalika, however, as the time required "would likely be more expensive than the total property in dispute." *Id.*

Stern then contacted Rabbi Milton Freedman, the rabbi who officiated at Kalika's marriage to Ms. Zlatin. Rabbi Freedman told Stern that he was a member of the Conservative Movement of Judaism and that a Get would be required to terminate a marriage performed by him. Stern Aff. ¶ 19. Stern confirmed that Rabbi Freedman was licensed to perform marriages by calling the Office of the City Clerk. *Id.*

After examining the divorce records and questioning Ms. Zlatin and Rabbi Freedman, Stern concluded that Ms. Zlatin did need a religious divorce. Stern also concluded that Plaintiff had falsely filed a DRL § 253 "removal of barriers to remarriage" statement in violation of DRL § 253(8).

Stern wrote to Kalika on December 26, 1990, stating "[i]t is apparent that the court was misled concerning your satisfaction of the requirements of [DRL § 253]." Ex. 4 to Stern Aff. In closing, Stern asked Kalika to contact him in order to make arrangements for the immediate completion of a Get. Stern indicated that if Kalika refused to cooperate, Ms. Zlatin planned to pursue any legal rights she may have in the circumstances. *See id.*

After Kalika failed to respond to his letter, Stern arranged a meeting sometime in February or March 1991 with Deputy District Attorney Charles Posner at the Office of the District Attorney of Kings County. Stern accompanied Ms. Zlatin to the meeting, and provided the District Attorney's Office with copies of the Kalika/Zlatin divorce papers. Stern also explained his understanding of DRL § 253, and its relation to the perjury laws. Ms. Zlatin provided the District Attorney's Office with the details of her religious background, her marriage to and subsequent divorce from Kalika, and her desire to obtain a Get. Assistant District Attorney Jay Shapiro recommended that Stern contact Kalika's former attorney, Melvyn J. Estrin, before any further steps were taken. Stern Aff. ¶ 21.

---

4. The exact date of the ceremony is disputed. The defendant insists that the marriage was performed on Thursday, Sept. 25, 1986, and provides the marriage certificate as proof of the date of the event. Ex. 34 to Stern Aff.

 Plaintiff maintains that the marriage ceremony occurred on Friday evening, Sept. 26, 1986. He offers the cover of the wedding photo album, which has "September 26, 1986" stamped on the cover. Ex. 2 to Affirmation in Opposition of Richard J. Kurtz Dated March 9, 1994 ("Kurtz Aff.") at 8. Kalika contends that the date on the certificate was falsified to hide that the ceremony was held in violation of the Jewish Sabbath. Kurtz Aff. ¶ 13–14.

5. It is unclear from the record whether the divorce action was filed in April or May of that year.

On March 12, 1991, Stern faxed a letter to Estrin to enlist his aid in persuading Kalika to give Ms. Zlatin a Get. In the letter, Stern explained to Estrin that he had been in contact with the District Attorney's Office but that he would wait seven days before further pursuing criminal charges against Kalika in order to allow Estrin an opportunity to discuss the matter with Kalika. *See* Ex. 6 to Stern Aff. Estrin then wrote to Kalika, enclosing Stern's letter, and advising him that he should "cooperate with Mr. Stern's request." Ex. 8 to Stern Aff. Again, Plaintiff failed to respond. At this point, Stern requested on behalf of Ms. Zlatin that the District Attorney's Office pursue criminal charges against Kalika for violating DRL § 253(8). *See* Ex. 11 to Stern Aff.

The record indicates that Stern was in contact with the Kings County District Attorney's Office between March and July of 1991. During this time, Stern met with and sent at least eight letters to Assistant District Attorneys Charles Posner, Jay Shapiro and Jane Meyers. During the course of the investigation, Esther Kalika, Plaintiff's current wife, contacted the District Attorney's Office. She informed Deputy District Attorney Posner that Kalika was willing to give Ms. Zlatin a Get in order to avoid being indicted, but that he did not understand why a Get was necessary since Ms. Zlatin was not Jewish. Affirmation of Charles Posner Dated January 26, 1994 ("Posner Aff.") ¶ 5. Posner advised Esther Kalika that the District Attorney's Office could give no assurances to her husband that he would not be indicted even if the Get was issued. *Id.* Plaintiff, on the other hand, alleges that it was his understanding that the District Attorney's Office would no longer pursue the case if he gave Ms. Zlatin a Get. Verified Complaint ¶ 23 ("Complaint").

At some point after Esther Kalika contacted Deputy District Attorney Posner, Plaintiff telephoned Stern to make arrangements for a Get proceeding. On June 8, 1991, Stern arranged for Kalika and Ms. Zlatin to appear before a Rabbinical board on the following day. At the Get proceeding, Kalika disclosed that his second marriage had been solem-

nized by a member of the Rabbinical Council of America. The Rabbinical board therefore indicated that further investigation would be required and declined to give Ms. Zlatin a "P'tur"—which is a certificate attesting to the Get. Stern Aff. ¶¶ 35–36.

On June 10, 1991, Stern sent a letter to Deputy District Attorney Posner confirming that the Get had taken place. *See* Ex. 17 to Stern Aff. That same day, Stern also sent a letter to Kings County District Attorney Charles J. Hynes thanking Hynes for his office's cooperation in helping Ms. Zlatin obtain a Get and expressing his concern that failure to prosecute "individuals like Mr. Kalika" undermines the deterrent power of DRL § 253. Ex. 18 to Stern Aff.

On July 25, 1991, Stern received an envelope in the mail from the rabbi who officiated at Plaintiff's marriage to Esther Kalika, Rabbi Mordecai N. Goldweig. The envelope contained two notarized letters, both stating that Ms. Zlatin is not Jewish. *See* Ex. 19 to Stern Aff. Based upon these letters, Rabbi Goldweig concluded that Ms. Zlatin was not Jewish and thereby agreed to officiate at Kalika's second marriage. *See* Stern Aff. ¶ 31. Stern faxed these affidavits to the District Attorney's Office and to the Rabbinical board which conducted the Kalika/Zlatin Get proceeding. Stern Aff. ¶¶ 34–35.

In order to receive a "P'tur," Stern obtained an affidavit from Ms. Zlatin's mother, Larisa Zlatin, as to her Jewish parentage. *See* Ex. 22 to Stern Aff. Stern also obtained a statement from a woman named Malka Finkelstein. Ms. Finkelstein's statement, translated from Yiddish, states that she was friends with Larisa Zlatin when they lived in the former Soviet Union, and that she knew Larisa Zlatin to be Jewish. Ex. 23 to Stern Aff.[6]

In August 1991, Kalika was indicted by a Kings County Grand Jury for violating DRL § 253(8). The District Attorney's Office decided to present the case to the Grand Jury despite the fact that the Get proceeding had occurred, and with full knowledge of Kalika's claim that Ms. Zlatin was not Jewish. Posner Aff. ¶ 8. During the course of the Grand

---

**6.** It is unclear from the record whether a "P'tur" was eventually granted.

Jury presentation, Kalika was given the opportunity to testify or to present any evidence on his own behalf but he declined to do so. Ex. 26 to Stern Aff., at 4–5. Ms. Zlatin testified before the Grand Jury that she is Jewish. Ex. 25 to Stern Aff., at 8. Stern did not appear or testify before the Grand Jury. During the criminal proceeding that followed, Kalika unsuccessfully challenged the sufficiency of the indictment. Following a bench trial, however, Kalika was acquitted of the charge.

In addition to the issue of Ms. Zlatin's Jewishness, Kalika disputes the religious validity of their marriage. Plaintiff points to the marriage certificate, which indicates that "Reverend," not "Rabbi," Milton Freedman performed the ceremony. Kurtz Aff. ¶ 11. Moreover, Kalika asserts that one of the ceremony's witnesses was not valid, under Jewish law, because of her gender. *See id.* at ¶ 12. Additionally, Kalika notes the discrepancy as to the date of the wedding. *See id.* at ¶ 13.

Defendant argues that Kalika and Ms. Zlatin *thought* that Freedman was a Rabbi. Stern notes that Freedman identified himself as a Rabbi in the subsequent Grand Jury proceeding against Plaintiff. Stern Aff. ¶ 41. Stern concedes that the female witness listed on the marriage certificate was invalid under Jewish law. He contends, however, that she acted as a witness solely for the state marriage license, rather than for the marriage ceremony. *Id.* at ¶¶ 85–86. In regard to the ceremony itself, Stern claims that Rabbi Freedman himself qualifies as a valid, second male witness under Jewish law. *Id.* at ¶ 86.

Plaintiff commenced the present action in the Supreme Court of the State of New York in June 1992. Defendant filed a notice of removal in August 1992, bringing the case to this Court based on diversity jurisdiction.[7] In his Complaint, Kalika alleges five causes of action: (1) intentional infliction of emotional distress, (2) prima facie tort, (3) malicious prosecution, (4) abuse of process and (5) defamation.

Plaintiff seeks $2.5 million ($500,000 for each cause of action) in damages, and $1 million in punitive damages. Stern now moves for summary judgment on all five claims. In addition, Stern seeks ·to have sanctions imposed against both Plaintiff and Plaintiff's counsel.

## DISCUSSION

### I. *Summary Judgment Standard*

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is thus entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to demonstrate that no genuine issue exists with respect to any material fact. *See Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975).

■ The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Eastman Machine Co. v. United States,* 841 F.2d 469, 473 (2d Cir. 1988). Material facts include only those facts which might affect the outcome of a particular claim. *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. No genuine issue exists as to any material fact

> unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The non-moving party, however, "cannot escape summary judgment merely

---

**7.** Plaintiff is a resident of the State of New York, while Defendant is a resident of the State of New Jersey.

by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citation omitted).

In addition, summary judgment is appropriate against a nonmovant who, after adequate time for discovery, fails to establish the existence of an element that is essential to his case and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *United States v. Pilot Petroleum Associates, Inc.,* 712 F.Supp. 1077, 1081 (E.D.N.Y.1989).

### II. *Malicious Prosecution Claim*

Under New York law, which is applied in this diversity suit, the elements of a cause of action for malicious prosecution are: (1) the initiation of a criminal proceeding by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) lack of probable cause; and (4) actual malice.[8] *Broughton v. State,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975) (citing Prosser, *Torts* (4th ed.) § 119), *cert. denied sub nom. Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).

Once an individual has been indicted, "the Grand Jury action creates a presumption of probable cause." *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *see also Lee v. City of Mount Vernon,* 49 N.Y.2d 1041, 429 N.Y.S.2d 557, 407 N.E.2d 404 (1980). The presumption may be overcome only by

> "evidence establishing that the ... witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have falsified or misrepresented evidence, that they have withheld evidence or otherwise acted in bad faith."

*Colon v. City of New York,* 60 N.Y.2d at 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248.

Kalika maintains that Stern acted in bad faith when he informed the District Attorney's office about the alleged violation of DRL § 253. He claims that Stern was not protecting Ms. Zlatin's interests, but rather was "motivated by greed, unbridled ambition, insatiable thirst for publicity [and] a hope for renown and fame in order to attract clients...." Complaint at ¶ 22. Kalika, however, provides no evidence in support of these vague assertions.

The record establishes that Stern made reasonable inquiry of the facts before taking any steps against Kalika. After Ms. Zatlin first approached Stern regarding her concerns about her divorce, Stern interviewed Ms. Zatlin and Rabbi Freedman. Stern also confirmed Rabbi Freedman's credentials to consecrate marriages with the City Clerk. Stern then wrote to Plaintiff, offering him an opportunity to avoid criminal proceedings, but received no response. It was not until this point that Stern first sought the aid of the District Attorney's Office.

Next, acting on the specific advice of the District Attorney's Office, Stern contacted Kalika's former attorney, Mr. Estrin. Agreeing with Stern, Mr. Estrin wrote to Kalika advising him to cooperate with Stern and provide the Get. Plaintiff again failed to respond.

The Court finds that the fact that Stern's letters were not answered by Kalika gave rise to a reasonable inference, from Stern's perspective, that Kalika was willfully withholding the Get from Ms. Zlatin. Moreover, it remains undisputed that Kalika did not in fact provide a Get to Ms. Zatlin before his civil divorce. Under these circumstances, Stern had ample reason to believe that Kalika's DRL § 253 verification was false and to ask the District Attorney's Office to proceed.[9]

---

8. The first two elements are not at issue here, as it is undisputed that Kalika was tried and acquitted of criminal charges related to the present case.

9. In addition, the Court notes that the reasonableness of Stern's belief that Zlatin needed a

Get does not hinge on whether the marriage was considered to be within the tenets of Orthodox, Conservative or Reform Judaism. *See Megibow v. Megibow,* 161 Misc.2d 69, 612 N.Y.S.2d 758 (N.Y.Sup.Ct.1994). Irrespective of the particular faiths' requirement of a Get to dissolve solem-

Plaintiff has not supplemented the record with any evidence indicating that Stern perjured himself, or withheld or misrepresented any information when communicating with the District Attorney's office about Kalika. The District Attorney's Office was well aware of the disagreement concerning Ms. Zlatin's need for a Get, as Kalika's wife told Deputy District Attorney Posner that she believed Ms. Zlatin was not Jewish. Further, Plaintiff offers no evidence in support of his claim that the Defendant was acting in bad faith. The Court thus finds that Plaintiff has not raised a material issue of fact to rebut the presumption of probable cause. Accordingly, summary judgment is granted as to the malicious prosecution claim.

### III. *Abuse of Process Claim*

■ The elements of an abuse of process claim under New York law are: (1) regularly issued civil or criminal process, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective. *Curiano v. Suozzi*, 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984). The collateral objective element is separate and distinct, and must occur after the process is issued; the mere fact that process has been issued does not give rise to a claim. *PSI Metals v. Firemen's Insurance Co. of Newark, N.J.*, 839 F.2d 42 (2d Cir. 1988) (no abuse of process under New York law where the defendant merely filed a counterclaim with the intention of causing plaintiff to expend money in defending the claim); *Perry v. Manocherian*, 675 F.Supp. 1417, 1429 (S.D.N.Y.1987) (issuance of a summons and complaint, even if made with the intent to coerce settlement and create bad publicity for the defendant, does not constitute abuse of process under New York law); *Curiano v. Suozzi*, 63 N.Y.2d at 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (malicious motive in issuing a summons does not establish abuse of process).

Here, Defendant's claimed motivation in pursuing criminal action against Kalika was

twofold: one, to obtain a Get for his client, Ms. Zlatin, and; two, to uphold DRL § 253(8). Given the specific provision under DRL § 253(8) that false verifications are subject to prosecution under N.Y.Penal Law § 210.40, lodging a criminal complaint against Kalika was a legitimate means for the Defendant to achieve his goals.

■ There simply is no evidence that Stern contacted the District Attorney's Office about Kalika's alleged violation of § 253 out of a desire for retribution or any other collateral objective. Kalika's assertion that Stern was motivated by a desire for "personal fame and renown" is unsubstantiated in the record. Plaintiff's abuse of process claim is therefore dismissed.

### IV. *Defamation Claim*

Plaintiff claims that Defendant's statements to the District Attorney's Office and to the Rabbinical board "constitute slander when spoken and libel when written" in that "individuals who would hear the statement [that Kalika was under a duty to grant Zlatin a Get] would consider the plainiff [sic] to be disgraced and discredited and his reputation would suffer...." Complaint at ¶ 36.

Stern makes three arguments in support of his motion for summary judgment on Kalika's defamation claim. First, Stern argues that Kalika has failed to comply with the pleading requirements for libel or slander because he did not specify the precise statements and communications of which he complains. Second, Stern claims that Kalika cannot sustain his burden of proving actual malice, which Kalika must do because the statements at issue are protected by a qualified privilege. Third, Stern argues that all of the factual statements which he made to the District Attorney's Office and to the Rabbinical board were true and therefore are not actionable.

### A. *CPLR 3016*

■ Defendant first argues that the defamation claim should be dismissed because

---

nized marriages, "the withholding of this voluntary act (of giving a Get) by plaintiff would, by statutory definition, constitute a 'barrier to re-

marriage,' if [Zlatin] perceived herself to require a Get in order to remarry." *Megibow v. Megibow*, 612 N.Y.S.2d at 760.

Plaintiff failed to comply with the strict pleading requirements of Section 3016 of New York's Civil Practice Law and Rules, which requires that in an action for libel or slander, "the particular words complained of shall be set forth in the complaint." N.Y.Civ. Prac.L. & R. § 3016 (McKinney 1991). In federal diversity cases such as this, however, procedural matters are governed by the Federal Rules of Civil Procedure. Therefore, "the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P." *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2nd Cir.1986) (quotation omitted).

 Pursuant to Rule 8, "each averment of a pleading shall be simple, concise, and direct." Fed.R.Civ.P. 8(e)(1). "The test of a complaint's sufficiency is whether it is detailed and informative enough to enable defendant to respond and to raise the defense of res judicata if appropriate." *Kelly v. Schmidberger,* 806 F.2d at 46 (quotation omitted). In a defamation case, "the central concern is that the complaint 'afford defendant sufficient notice of the communications complained of to enable him to defend himself.'" *Id.* (quoting *Liguori v. Alexander,* 495 F.Supp. 641, 647 (S.D.N.Y.1980)). Complaints which do not specifically plead the allegedly defamatory words have been held sufficient. *See id.* Here, the Court finds that Plaintiff's averments in paragraph 38 of the Complaint provide Defendant with sufficient notice of the statements which Plaintiff alleges were defamatory.

## B. *Qualified Privilege*

 Stern further argues that the alleged defamatory statements are protected by a qualified privilege arising from Stern's duty to report apparent criminal activity to the District Attorney's Office and from his duty to report apparent violations of Jewish religious law to the Rabbinical board. Under New York law:

> A communication made by a person with an interest or duty to make the communication and sent to a person with a corresponding interest or duty is protected by a qualified privilege, even though without the privilege the communication would be "slanderous and actionable."

*Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 62 (2nd Cir.1993) (quoting *Olivieri v. McDonald's Corp.,* 678 F.Supp. 996, 1001 (E.D.N.Y.1988)) (applying New York law).

 The defendant bears the initial burden of establishing that his statements are qualifiedly privileged. *See, e.g., Garson v. Hendlin,* 141 A.D.2d 55, 532 N.Y.S.2d 776, 780 (2d Dept.1988) (party asserting qualified privilege defense "must establish that the allegedly defamatory statement was made upon an occasion furnishing a prima facie justification for its publication"), *appeal denied,* 74 N.Y.2d 603, 543 N.Y.S.2d 396, 541 N.E.2d 425 (1989). "Once the defendant has proved that [he] is entitled to a qualified privilege, there arises a rebuttable presumption of good faith that may constitute a complete defense." *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d at 62. The burden then shifts to the plaintiff to show that the defendant was motivated by "actual malice or ill will." *Toker v. Pollak,* 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978).

 Under New York law, proof of malice is governed by two standards: the first amendment malice standard set forth by the United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and the common law malice standard. *Liberman v. Gelstein,* 80 N.Y.2d 429, 437–38, 590 N.Y.S.2d 857, 862, 605 N.E.2d 344, 349 (1992). Under the *New York Times v. Sullivan* standard, "the plaintiff must demonstrate that the 'statements [were] made with [a] high degree of awareness of their probable falsity.'" *Liberman v. Gelstein,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)). The common law defines malice as "spite or ill will." *Liberman v. Gelstein,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344. In this context, spite or ill will refers to the speaker's motivation for making the statements at issue. *Liberman v. Gelstein,* 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344.

 The Court finds that there is no factual dispute that precludes it from ruling, as a matter of law, that Stern's statements

about Kalika are subject to a qualified privilege. New York courts have held that good faith communications to a prosecutor regarding possible criminal activity prior to the commencement of a proceeding are qualifiedly privileged. *See Patane v. Griffin,* 164 A.D.2d 192, 562 N.Y.S.2d 1005, 1008 (3rd Dept.1990) (citing *Toker v. Pollak,* 44 N.Y.2d at 221, 405 N.Y.S.2d 1, 376 N.E.2d 163). This privilege "foster[s] the public purpose of encouraging citizens to come forth with information concerning criminal activity." *Toker v. Pollak,* 44 N.Y.2d at 221, 405 N.Y.S.2d 1, 376 N.E.2d 163. Further, New York courts recognize a "common interest" qualified privilege in cases "where members of an organization discuss among themselves matters of concern to the organization." *Brockman v. Frank,* 149 Misc.2d 399, 401, 565 N.Y.S.2d 426 (N.Y.Sup.Ct.1991). The "common interest" qualified privilege has been applied to protect statements made by members of church hierarchy and members of a church council. *See id.* (citing *Matter of Kantor v. Pavelchak,* 134 A.D.2d 352, 520 N.Y.S.2d 830 (2d Dept.1987)). The Court thus finds that Stern's communications with both the District Attorney's Office and the Rabbinical board are entitled to a conditional qualified privilege.

▆ Having determined that Stern's communications with the District Attorney's Office about Kalika were conditionally protected by a qualified privilege, the burden shifts to Kalika to show that Stern acted with malice. The Court finds, however, that Kalika fails to satisfy this burden regardless of which standard of proof is applied. Applying the *New York Times v. Sullivan* standard, it is clear from the record that Stern made a good faith effort to determine the veracity of Ms. Zlatin's claim by examining the divorce papers and questioning Ms. Zlatin and Rabbi Freedman. Even if Stern was not *sure* of Ms. Zlatin's need for a Get, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false." *Liberman v. Gelstein,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344.

Applying the common law malice standard, there is no evidence that Stern's motive was to defame or to spite Kalika. In the Complaint, Kalika makes allegations as to Stern's motive. Kalika claims that Stern was motivated by the "concealed purpose of establishing a profitable law practice for himself, based upon the publicity and notoriety of having been the individual who engineered the first successful prosecution under DRL § 253." Complaint at ¶ 29. Whether or not this particular allegation is true is irrelevant to the Court's determination of proof of malice. Kalika has simply failed to put forth any evidence of spite or ill will on Stern's part.

The Court thus concludes that there is insufficient evidence of malice under both the *New York Times v. Sullivan* standard and the common law standard. Because Plaintiff has failed to raise a fact issue on malice, this cause of action must be dismissed.

### C. *Truth of Statements*

For the reasons discussed above, Plaintiff's defamation claim must be dismissed. The Court therefore declines to address Defendant's argument that all of the factual statements made to the District Attorney's Office and to the Rabbnical Board were true.

### V. *Intentional Infliction of Emotional Distress Claim*

Kalika claims that Stern's "conduct ... was intentional and for the purpose of causing severe mental distress to the Plaintiff and his conduct was shocking and outrageous and exceeded all reasonable bounds of decency." Complaint at ¶ 27. The Complaint provides no further allegations regarding the nature or source of Plaintiff's distress.

▆ Under New York law, the four elements comprising a claim for intentional infliction of emotional distress are: 1) extreme and outrageous conduct; 2) intention to cause distress, or knowledge that defendant's conduct would result in emotional distress; 3) severe emotional distress; and 4) a causal connection between the defendant's conduct and the plaintiff's injury. *See Gay v. Carlson,* 60 F.3d 83, 89 (2d Cir.1995) (applying New York law). New York courts have been strict in applying these elements. *Id.* Here, Kalika has failed to even minimally establish two of the four elements required to prevail

on a claim for intentional infliction of emotional distress—severe misconduct and Defendant's intent to cause emotional distress.

██ In order for a claim for intentional infliction of emotional distress to be actionable, the alleged conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (quoting Restatement [Second] of Torts § 46, comment d (1979)). The Court finds that the behavior alleged—Stern's communications with the District Attorney's Office, the Rabbinical board, and others regarding the veracity of Kalika's DRL § 253 statement—does not constitute, as a matter of New York law, conduct which may be deemed outrageous. Stern had an obligation to his client, Ms. Zlatin, to investigate her case and to advance her legal interests, and his conduct was entirely reasonable.

Moreover, there is no evidence that Stern's conduct was intended to inflict emotional distress on Plaintiff. Kalika's conclusory allegation that Stern's "conduct was intentional" does not fulfill his obligation as the non-moving party to set forth a specific fact showing that there is a genuine issue for trial. The Court therefore grants summary judgment as to this claim.

### VI. *Prima Facie Tort Claim*

██ Under New York law, harm which is intentionally inflicted is prima facie actionable unless justified. *Curiano v. Suozzi,* 63 N.Y.2d at 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324. This principle has evolved into a specific cause of action with four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. *Id.* In addition, the plaintiff must allege that the defendant was motivated by "disinterested malevolence." *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 333, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). In regard to the intent requirement, "if a defendant's motive is tainted by self interest, profit or business advantage, a prima facie tort action cannot be sustained." *Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1239 (S.D.N.Y.) (applying New York law), *aff'd,* 43 F.3d 1458 (2d Cir.1994). Here, Kalika has failed to put forth any evidence that Stern was motivated by "disinterested malevolence." On the contrary, the facts alleged by Kalika in the complaint indicate that Defendant was motivated by his own self interest. *See* Complaint at ¶ 12 (Defendant was motivated by his "concealed purpose of establishing a profitable law practice for himself, based upon the publicity and notoriety of having been the individual who engineered the first successful prosecution under DRL § 253"). Thus, assuming that Kalika's allegations as to Stern's intent are true, they are contrary to the requirements of a prima facie tort.[10] Therefore, the Court grants summary judgment as to this claim.

### VII. *Rule 11 Sanctions*

██ Finally, Stern urges the Court to sanction Plaintiff and Plaintiff's counsel pursuant to Rule 11 of the Federal Rules of Civil Procedure. Because the Complaint in this action was removed from state court, however, Rule 11 is inapplicable. *See, e.g., Mareno v. Jet Aviation of Am., Inc.,* 970 F.2d 1126, 1128 (2d Cir.1992) ("Rule 11 has no retrospective application to a complaint filed in state court even if the action subsequently is removed to federal court"), *cert. denied,* 507 U.S. 966, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993). Rule 11 may apply to papers filed in the federal forum after the action has been removed. *See id.* In the present case, however, Plaintiff has not filed any sanctionable papers with the Court. Defendant's motion for Rule 11 sanctions is therefore denied.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED

---

10. Additionally, plaintiff does not allege any specific damages. Instead, plaintiff only offers a broad, conclusory allegation that the "defendant caused pecuniary loss to the plaintiff." Complaint at ¶ 29.

as to all five claims. Defendant's motion for sanctions pursuant to Rule 11 is DENIED.

SO ORDERED.